# Exhibit A

**BEFORE THE**
**UNITED STATES JUDICIAL PANEL ON**
**MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: VIDEO GAME ADDICTION PRODUCT LIABILITY LITIGATION | MDL No.: _____ |

**PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. §1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Plaintiffs Casey Dunn and Thomas Dunn, Individually, and on behalf of G.D., a minor; Plaintiffs Preston Johnson and Elizabeth Jones; Plaintiffs Cynthia Jimenez, Individually and on behalf of I.C., a minor; Plaintiffs Jacyln Angelilli, Individually and on behalf of D.G., a minor; and Plaintiff Harper Glasscock (collectively, "Movants"[1] respectfully move the Judicial Panel on Multidistrict Litigation ("Panel"), pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Panel, to transfer the actions listed in the attached Schedule of Actions and all subsequent tag-along actions to the United States District Court for the Western District of Missouri for coordinated or consolidated proceedings before the Honorable Stephen Bough who is currently presiding over the *In re: Smitty's/Cam2 303 Tractor Hydraulic Fluid Marketing, Sales Practices and Products Liability Litigation*, MDL No. 20-md-2936, and has presided over class actions and other litigation involving numerous parties, or alternatively Honorable Brian C. Wimes who is assigned to the current Missouri case pending in the Western District of Missouri.

---

[1] Movants are the named plaintiffs in the first five cases filed in this matter, which are presently pending in the United States District Courts for the Eastern District of Arkansas, Northern District of Illinois, Southern District of Illinois, and the Western District of Missouri. *See* Schedule of Actions.

Plaintiffs also contemporaneously submit their memorandum in support of this motion, incorporated herein by reference, setting forth the reasons why these cases should be transferred to the Western District of Missouri, or alternatively, to the Eastern District of Arkansas. For the reasons therein, Movants respectfully request that the Panel transfer the scheduled actions and any additional tag-along actions to the Western District of Missouri for coordinated or consolidated pretrial proceedings before either the Honorable Stephen R. Bough or the Honorable Brian C. Wimes, or alternatively the Eastern District of Arkansas before the Honorable James M. Moody, Jr.

Dated: March 14, 2024.

Respectfully submitted,

/s/ Tina M. Bullock
Tina M. Bullock
Danielle W. Mason
BW Walas
**BULLOCK WARD MASON LLC**
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
Tel: (833) 296-5291
Tina@bwmlaw.com
Danielle@bwmlaw.com
Bwalas@bwmlaw.com

Steven B. Rotman
**HAUSFELD**
One Marina Park Drive
Suite 14010
Boston, MA 02210
Tel: (617) 207-0600
Srotman@hausfeld.com

Ashleigh Raso
Dan Nigh
**NIGH GOLDENBERG**
**RASO & VAUGHN PLLC**
60 South 6th Street, Suite 2800
Minneapolis, Minnesota 55402
Tel: (202) 792-7927

araso@nighgoldenberg.com
dnigh@nighgoldenberg.com

***ATTORNEYS FOR MOVANTS***

**BEFORE THE**
**UNITED STATES JUDICIAL PANEL ON**
**MULTIDISTRICT LITIGATON**

| | |
|---|---|
| **IN RE: VIDEO GAME ADDICTION PRODUCT LIABILITY LITIGATION** | **MDL No.:** _____ |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407**
**FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

DATED: March 14, 2024

# Table of Contents

I.   INTRODUCTION ................................................................................................................ 1

II.   LEGAL STANDARD ........................................................................................................ 4

III.  ARGUMENT .................................................................................................................... 4

   A. Transfer is Appropriate Under 28 U.S.C. § 1407. ......................................................... 5

     1.   The Actions Involve Common Factual and Legal Issues. ................................................. 6

     2.   Transfer Will Serve the Convenience of the Parties and Witnesses and Will Promote the Just and Efficient Conduct of the Actions. ........................................................................... 8

     3.   Transfer will Eliminate Duplicative Discovery. .............................................................. 9

     4.   Transfer will Avoid Conflicting Rules and Schedules. .................................................. 10

   B. The Western District of Missouri is the Most Appropriate Transferee Venue. ..................... 11

   C. Alternatively, the Eastern District of Arkansas is an Appropriate Transferee Venue. .......... 14

IV.  CONCLUSION ............................................................................................................. 16

# I.    INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("Panel"), Plaintiffs Casey Dunn and Thomas Dunn, Individually, and on behalf of G.D., a minor; Plaintiffs Preston Johnson and Elizabeth Jones; Plaintiffs Cynthia Jimenez, Individually and on behalf of I.C., a minor; Plaintiffs Jacyln Angelilli, Individually and on behalf of D.G., a minor; and Plaintiff Harper Glasscock (collectively, "Movants"), respectfully submit this memorandum in support of their Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings.

Movants seek transfer and assignment of all pending actions against Defendants Activision Blizzard, Inc., Apple, Inc., Blizzard Entertainment, Inc., BlueStacks by Now.GG, Inc. d/b/a BlueStacks, Electronic Arts, Inc., Epic Games, Inc., Google, LLC, Infinity Ward, Inc., Microsoft Corporation, Mojang Studios, MSI Computer Corporation, Nintendo of America, Inc., Raven Software Corporation, Roblox Corporation, Rockstar Games, Inc., Rockstar North Limited,[1] Sony Interactive Entertainment, LLC, Sledgehammer Games, Inc., Take-Two Interactive Software, Inc., Treyarch Corporation, Ubisoft Divertissements, Inc. d/b/a Ubisoft Montreal, Ubisoft Entertainment, and Jane and John Does I-XX (collectively, "Defendants") related to injuries caused by video games, as alleged in several cases filed nationwide, listed in the Schedule of Actions (the "Actions"), as well as any subsequently-filed actions involving similar facts or claims, to the United States District Court for the Western District of Missouri before the Honorable Stephen R. Bough, or in the alternative, the Honorable Brian C. Wimes, who handles cases in the Western District and Eastern District of Missouri. There are presently not less than five substantially similar actions, filed on behalf of ten plaintiffs, three of whom are minors and five of

---

[1] Defendant has advised that the correct entity name is Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited.

whom are parents or legal guardians of minors who have been significantly and irreparably injured by video game addiction. These Actions are pending in four different federal district courts across the United States and allege similar wrongful conduct by Defendants. Movants are plaintiffs in all five of the first filed cases presently pending in the United States District Courts for the Eastern District of Arkansas, Southern District of Illinois, Northern District of Illinois, and Western District of Missouri.

All of the Actions involve common questions of fact and law that arise from Defendants' design, development, manufacture, publishing, marketing, supply, and sale of video game products across the United States which reach millions of affected consumers, and which contain harmful and psychologically addictive features. The Actions arise out of injuries caused by Defendants' video game products that were intentionally designed to be addictive and Defendants' active concealment of the addictive nature and associated harms caused by their video game products.

Video game addiction, or internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, which results in both physical and financial harm, as well as a loss of social function and cognitive decline. These harmful consequences have created a mental health epidemic among minors, young adults, and neurodivergent individuals who are most susceptible to the predatory tactics and addictive schemes embedded within the Defendants' games while Defendants monetized these schemes to maximize their profits. Researchers have concluded video game addiction leads to a wide variety of debilitating conditions, including stress, aggressive behavior, loss of impulse control, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, inability to function in school or as a self-supporting member of society and other behavioral addictions. Young people and children are engaging in hours of play while ignoring

basic needs like food, sleep and hygiene. In 2008, the United States Federal Communications Commissioner stated that online gaming addiction is one of the top reasons for college dropouts in the country. Brain imaging studies have shown that long-term video game play affects the brain regions responsible for reward, impulse control, and sensory-motor coordination, and causes structural changes in the brain, particularly a reduction in white matter density and gray matter volume.

Defendants, who enlisted the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use in the design and development of their games, knew and/or should have known that the predatory methods they employed to increase and prolong gameplay, i.e. use of feedback loops, reward systems, operant conditioning, and rubber-banding, for example, could and would lead to mental and cognitive decline, social impairment, and irreversible brain damage and other brain injury. To date, no game in this litigation contains a warning to parents or users that addictive behavior can develop after engaging in gameplay for only a few weeks, nor do the games contain a warning that for children within a certain age range, brain damage and injury can result and cause permanent harm that cannot be rehabilitated. Instead, Defendants tracked the gaming behavior of the minors and young adults playing their games in violation of The Children's Online Privacy Protection Act and exploited their users to ensure longer game play and to entice them to spend money on in-game purchases, or "microtransactions". Defendants utilize patented algorithms that are designed to study the skill level and behavior of the user so the game can bombard the minor with solicitations to purchase additional downloadable game upgrades based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Each of these aspects in conjunction work to make players addicted to video

games. Consequently, gaming disorder is recognized as a condition by the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5")—the only behavioral addiction recognized by the DSM-5. As a result of the advent of online, cloud, and streaming games incorporating these addictive and predatory tactics and in-game monetization schemes, Defendants' video games have led to an estimated three to six million children and young adults in the United States being non-functional gaming addicts. Defendants are aware of these negative consequences, but nonetheless intentionally designed their video game products to take advantage of the chemical reward system of a user's brain and to create addictive behavior in users, despite the negative consequences and risk of harm to such users. The Actions currently pending, and the numerous subsequent filings anticipated, seek to hold Defendants liable for such conduct.

## II. LEGAL STANDARD

Transfer is appropriate when actions pending in different judicial districts involve similar questions of fact such that coordinating or consolidating pretrial proceedings would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. In relevant part, Section 1407 provides as follows:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

*Id*. *See also In re Nifedipine*, 266 F. Supp. 2d 1382, 1382 (J.P.M.L. 2003).

## III. ARGUMENT

The Actions, and the many tag-along actions that will certainly follow, are appropriate for Section 1407 transfer because they involve common factual issues and transfer will benefit the

parties, witnesses, and the court system. Further, given that the Western District of Missouri is a geographically central and easily-accessible location, along with the fact that one of the five Actions is currently pending in the Western District of Missouri, transfer to that district is the most appropriate. Alternatively, transfer to the Eastern District of Arkansas would be appropriate given its geographically central and accessible location, along with the fact that two of the five Actions are currently pending in the Eastern District of Arkansas.

**A. Transfer is Appropriate Under 28 U.S.C. § 1407.**

Transferring and consolidating these Actions promotes the purpose of Section 1407. The purpose of Section 1407 is to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinating district and appellate courts in multidistrict related civil actions. *See In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968). Centralization is meant to "eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017).

The Actions involve the same or similar material facts, the same or similar Defendants, and the same or similar legal claims. Movants anticipate the number of cases to grow by the day, being aware of at least ten cases that will be filed involving the same or similar common facts and issues prior to this Petition being heard by the Panel, and Movants anticipate hundreds, if not thousands, of subsequently filed actions will involve the same or similar circumstances and defendants. Unless these cases are transferred for pretrial proceedings, the parties will incur excessive costs due to duplicative discovery and will face the risk of inconsistent rulings on a variety of matters.

1. **The Actions Involve Common Factual and Legal Issues.**

Each of the constituent Actions assert overlapping claims based on common factual allegations and will require adjudication of whether Defendants violated state product liability laws, deceptive trade practices statutes, and other tort laws, and committed fraud and common law negligence in their design, development, manufacture, marketing, and sale of video game products and services. This Panel has noted that Section 1407 "does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 2d 1361, 1363 (J.P.M.L. 2014) (quotation omitted). The allegations in these Actions, however, are consistent and materially identical with respect to Defendants' respective video game products and conduct. Defendants knew or should have known that their video game products and services were addictive, dangerous, and defective and they designed, developed, manufactured, marketed, and sold them across the country while intentionally hiding the true addictive nature and harms associated with their products. Further, all games utilize microtransactions to reward continued play and further addiction. Therefore, such allegations do provide for common questions of fact and injuries in addition to common issues of law.

The allegations set forth in the Complaints demonstrate the basis of each of the Actions. It is clear from these allegations that common questions of fact and issues of law exist across each of the Actions, including, but are not limited to:

- How did Defendants design, develop, manufacture, market, supply, distribute, and/or sell their video game products;

- Whether Defendants designed and developed their video game products to be psychologically addictive;

- Whether Defendants failed to warn consumers of the risk of internet gaming disorder and/or addiction inherent in or associated with use of their video game products;

- Whether Defendants concealed the addictive nature of their video game products from the public and/or misrepresented the safety of their video game products to the public;

- Whether Defendants knew or should have known of publicly available studies demonstrating the adverse impact of prolonged video-game use on the brain development and brain injury to minors, young adults, and neurodivergent individuals;

- Whether prolonged use of Defendants' addictive video game products harmed and injured minor, young adult, and neurodivergent users of those products;

- Whether Defendants violated deceptive trade practice statutes, products liability laws, warranty laws, and other tort laws by marketing and selling their psychologically addicted video game products and services while hiding their addictive nature.

- Whether video game addiction has caused financial harm to Plaintiffs and for how long the harm will continue for gamers with addictions that thwarted ability to obtain an education or work.

- Whether Defendants violated Children's Online Privacy Protection Act by maintaining and tracking data of minors;

- Whether Defendants were engaged in a civil conspiracy and/or acted in concert in harming Plaintiffs; and

7

- Whether the Actions are subject to arbitration.

Adjudicating these and other common issues in a single transferee district will benefit the parties and witnesses and promote judicial efficiency by allowing a single court to coordinate the pretrial proceedings governing claims with these issues. Further, each of the constituent Actions contains similar theories of recovery. Given the common questions of law and fact, transfer and centralization is appropriate here.

### 2. Transfer Will Serve the Convenience of the Parties and Witnesses and Will Promote the Just and Efficient Conduct of the Actions.

Transferring these Actions to a single court for coordinated or consolidated pretrial proceedings promotes efficiency and convenience for both Plaintiffs and Defendants. Transfer and coordination or consolidation under a single judge for pretrial proceedings also promotes consistency in the legal rulings and the discovery process. The purpose of the multidistrict litigation process is to "eliminate the potential for contemporaneous pretrial rulings by coordinating district and appellate courts in multidistrict related civil actions." *In re Multidistrict Private Civ. Treble Damages Litig.*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968). According to the Manual for Complex Litigation, the following four factors govern whether transfer will facilitate the convenience of the parties and promote the just and efficient conduct of the transferred cases: (1) The elimination of duplicative discovery; (2) the avoidance of conflicting rules and schedules; (3) the reduction of litigation cost; and (4) the conservation of the time and effort of the parties, attorneys, witnesses, and courts. MANUAL FOR COMPLEX LITIGATION (FOURTH), § 20.131, at 219.

With five cases filed on behalf of ten plaintiffs in four different districts—and with those numbers expected to substantially increase in the very near future—the size of this litigation weighs in favor of transfer. Movants anticipate many more filings, as there are an estimated three to six million minors and young adults who are suffering from video game addiction and the harms

flowing from their addiction. Transfer is, therefore, beneficial because the pending Actions will rely upon the same factual allegations to support their claims, are in the same stage of litigation, and are based on materially identical conduct. *See In re Air Crash at Tegucigalpa, Honduras, on May 30, 2008*, 598 F. Supp. 2d 1368 (J.P.M.L. 2009) ("Although only two actions are pending, centralization under Section 1407 is more suitable than informal coordination given that both actions have been pending for nearly the same length of time and arise from the same accident."); *In re Helicopter Crash Near Wendle Creek, British Columbia on August 8, 2002*, 350 F. Supp. 2d 1358 (J.P.M.L. 2004) (creating multidistrict litigation for four pending actions arising out of same helicopter crash); *In re Terrorist Attacks on September 11, 2001*, 295 F. Supp. 2d 1377 (J.P.M.L. 2003) (centralizing six pending actions against alleged supporters of terrorists who injured or killed plaintiffs in September 11, 2001 terrorist attacks).

Indeed, without transfer and centralization, this litigation, which addresses a serious product defect contained within a significant majority of video games currently on the market in the United States, would create the needless and unnecessary expense of overlapping discovery (including expert discovery) and judicial inefficiency. Further, different federal courts would make duplicative rulings on the same issues, which could result in contradictory findings on significant pretrial disputes. This possibility of inconsistent rulings on pretrial issues weighs in favor of transfer due to possible *res judicata* or collateral estoppel effects on other cases. *See In re Enron Securities Derivative & ERISA Litig*., 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (granting a transfer in part to prevent inconsistent pretrial rulings). Litigation of this scope and importance should not be beset with such inconsistencies and inefficiencies.

### 3. Transfer will Eliminate Duplicative Discovery.

Because each Action is based upon similar facts and presents similar legal issues, plaintiffs in each of the Actions are, in turn, likely to seek overlapping discovery. *See In re Auto Body Shop*,

2014 WL 3908000, at *1-2 (J.P.M.L. 2014) (noting that transfer was appropriate to eliminate duplicative discovery when the actions shared a common factual core). The Actions are also likely to involve complicated, technical issues regarding the patents and algorithms designed by Defendants for their games that will most likely result in substantial expert discovery and *Daubert* briefing and hearings, as will discovery regarding the negative effects of Defendants' patents and algorithms. These facts alone strongly favor transfer. *See, e.g., In re Natrol, Inc. Glucosamine/Chondroitin*, 2014 WL 2616783, at *1 (J.P.M.L. 2014). Similarly, plaintiffs in each of the Actions are likely to seek to depose many of the same corporate witnesses of Defendants, which again favors centralization. *See, e.g., In re Auto Body Shop*, 2014 WL 3908000, at *1 (transfer to a single judge was beneficial because he or she could "structure pretrial proceedings to accommodate all parties' legitimate discovery needs while ensuring that common witnesses are not subjected to duplicative discovery demands"); *In re Enfamil Lipil*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("Centralizing the actions will allow for the efficient resolution of common issues and prevent unnecessary or duplicative pretrial burdens from being placed on the common parties and witnesses.").

Given the similarity of the Actions and the potential for duplicative discovery, transfer to a centralized venue will undoubtedly conserve the parties' resources. *See, e.g., In re Air Crash at Dallas/Fort Worth Airport*, 623 F. Supp. 634, 635 (J.P.M.L. 1985). Transfer will conserve the courts' resources, as it would assign responsibility for overseeing a pretrial plan to one judge as opposed to many different federal judges. *See, e.g., In re PineIntel*, 342 F. Supp. 2d 1348, 1349 (J.P.M.L. 2004).

### 4. Transfer will Avoid Conflicting Rules and Schedules.

Pretrial procedures will necessarily involve Defendants' motions to compel arbitration as well as dismissal motions, discovery motions, and *Daubert* motions. Without transfer and

centralization, conflicting rulings on these motions across several courts will cause unnecessary confusion, prejudicial delay of discovery and duplicative effort. Further, although only four district courts presently have cases, given the sheer number of video game products at issue there will undoubtedly be many more materially similar cases filed across the United States. Already in these four districts, Movants are facing the difficulties of overlapping briefing schedules on the same issues across multiple jurisdictions, and these difficulties will only increase. Section 1407 transfer is thus the most efficient way to ensure that pretrial processes across these cases are uniformly litigated and adjudicated, thereby avoiding the situation where multiple courts reach contrary conclusions and potentially subject litigants to conflicting responsibilities and obligations.

Each of the Actions, and the many tag-along actions soon to follow, will benefit from having a single transferee court address and adjudicate issues related to discovery and pretrial motion practice. Otherwise, courts and lawyers may be briefing the same issues in several different district courts, across several circuits, with conflicting laws, witnesses may be called to depositions in numerous cases, and third parties may be called to produce documents and witnesses in several different cases.

## B. The Western District of Missouri is the Most Appropriate Transferee Venue.

The Panel balances a number of factors in determining the transferee venue, including: the experience, skill and caseloads of the available judges; the number of cases pending in the jurisdiction; the convenience of the parties; the location of the witnesses and evidence; and the minimization of cost and inconvenience to the parties. *See In re: Preferential Drugs Prods. Pricing Antitrust Litig.*, 429 F. Supp. 1027, 1029 (J.P.M.L. 1977); *In re: Tri-State Crematory Litig.*, 206 F. Supp. 1376, 1378 (J.P.M.L. 2002).

The Western District of Missouri is an appropriate central location for transfer and consolidation of the Actions. First, one of the filed Actions is currently pending before Judge Brian

C. Wimes in the Western District of Missouri and more cases in that district are forthcoming. Second, current defendants Microsoft Corporation (a defendant in all the Actions), Epic Games, Inc. (a defendant in four Actions), Google, LLC (a defendant in three Actions), Nintendo of America, Inc. (a defendant in three Actions), Sony Interactive Entertainment, LLC (a defendant in one Action), Electronic Arts, Inc. (a defendant in one Action), and Apple, Inc. (a defendant in one Action) have all registered with and are authorized to do business in the State of Missouri. Third, all Defendants introduced their defective and dangerous video game products and services into interstate commerce with knowledge and intent that such products be sold throughout the United States, including in the State of Missouri. Fourth, the Western District of Missouri is a geographically central and accessible forum to the jurisdictions where other actions are presently pending (district courts in Arkansas and Illinois). Fifth, as Defendants' principal places of business are primarily on either the East or West Coast of the United States, centralization of this nationwide litigation in the middle of the country will provide a convenient, cost-effective location for all parties and witnesses. *See In re: Tri-State Crematory Litig.*, 206 F. Supp. at 1378 (focusing on the proposed transferee venue's geographic location and convenience); *see also In re Polyester Staple Antitrust Litig.*, 259 F. Supp 2d. 1376 (J.P.M.L. 2003). Sixth, as approximately 177 million children and young adults in the United States play video games and, of those users, approximately 3-6 million children and young adults suffer from internet gaming disorder and/or addiction along with the accompanying damages stemming from the addiction, the likelihood that many more cases will be filed involving the same or similar issues, a centralized venue would be appropriate to fairly accommodate a litigation affecting the entire country.

Centralization in the Western District of Missouri is also appropriate because there are ample accommodations for business travelers and is serviced by an international airport with routes

to every corner of the country. *See* Gregory Hansel, Extreme Litigation: *An Interview with Judge Wm. Terrell Hodges, Chairman of the Judicial Panel on Multidistrict Litigation*, 19 Me. B.J. 16, 19 (2004) ("[W]e take into account…the accessibility of the court, particularly air travel in selecting a transferee district."). More specifically, and relevant this litigation, there are direct flights to this venue from these cities—Long Beach, California; Los Angeles, California; Oakland, California; San Diego, California; San Francisco, California; Toronto, Canada; Atlanta, Georgia; Chicago, Illinois, New York, New York, Charlotte, North Carolina; and Seattle, Washington— along with connections to all major airline hubs, thereby making Kansas City, Missouri easily accessible to all parties and witnesses. Additionally, as the largest city in Missouri, Kansas City has sufficient lodging options to accommodate the parties, counsel, and witnesses travelling for hearings and other matters before the Court. In sum, the infrastructure is certainly in place to host this MDL. Regardless, remote access to hearings also allows for high participation by all parties involved without need for travel.

Moreover, the Western District of Missouri has capable judicial and court staff with a long history of successfully managing high-profile multidistrict litigations. *See, e.g.*, *In re T-Mobile Customer Data Sec. Breach Litig.,* 576 F.Supp.3d 1373 (J.P.M.L. 2021); *In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.*, 571 F.Supp.2d 1374 (J.P.M.L. 2008). Additionally, the Western District of Missouri is currently home to three multidistrict litigations: T-Mobile 2022 Customer Data Security Breach Litigation, MDL No. 23-md-3073; Smitty's/Cam2 303 Tractor Hydraulic Fluid Marketing, Sales Practices and Products Liability Litigation, MDL No. 20-md-2936; and Dollar General Corp. Motor Oil Marketing and Sales Practices Litigation, MDL No. 16-md-2709. *See In re T-Mobile 2022 Customer Data Sec. Breach Litig.,* 2023 U.S. Dist. LEXIS 97670, __ F.Supp.3d __ (J.P.M.L. June 2, 2023); *In re Smitty's/CAM2 303 Tractor Hydraulic*

*Fluid Mktg., Sales Practices & Prods. Liab. Litg.*, 466 F.Supp.3d 1380 (J.P.M.L. 2020); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, 190 F.Supp.3d 1361 (J.P.M.L. 2016).

The Western District of Missouri docket also demonstrates that the court has the capacity to handle this litigation. As of February 29, 2024, the Western District of Missouri reports it has 1400 cases on the civil docket and 1123 on the criminal docket.

The Western District of Missouri, United States District Judge Stephen Bough is also an excellent jurist who could preside over this litigation. Judge Bough has experience handling multi-faceted, high-profile cases during his nine years on the bench. For example, Judge Bough is currently presiding over the *In re: Smitty's/Cam2 303 Tractor Hydraulic Fluid Marketing, Sales Practices and Products Liability Litigation*, MDL No. 20-md-2936, and has presided over class actions and other litigation involving numerous parties.

Accordingly, based upon the factors considered by the Panel, the Western District of Missouri, in Kansas City, is the appropriate transferee venue for this litigation.

## C. Alternatively, the Eastern District of Arkansas is an Appropriate Transferee Venue.

Based upon the factors considered by the Panel, cited above, the Eastern District of Arkansas, in Little Rock, is the appropriate transferee venue for this litigation. First, two of the filed Actions are currently pending before Judge James M. Moody, Jr. in the Eastern District of Arkansas. Second, current defendants Microsoft Corporation (a defendant in all Actions), Nintendo of America, Inc. (a defendant in three Actions), and Sony Interactive Entertainment, LLC (a defendant in one Action) have registered with and is authorized to do business in the State of Arkansas. Third, all Defendants introduced their defective and dangerous video game products and services into interstate commerce with knowledge and intent that such products be sold throughout the United States, including in the State of Arkansas. Fourth, as Defendants' principal

14

places of business are primarily on either the East or West Coast of the United States, centralization of this nationwide litigation in the middle of the country will provide a convenient, cost-effective location for all parties and witnesses. Little Rock is such a location, being a geographically central and accessible forum to the jurisdictions where other actions are presently pending (district courts in Illinois and Missouri). Further, Little Rock is accessible to the Defendants' various headquarters which are primarily located in California, Washington, New York, and North Carolina. *See, e.g., In re: Tri-State Crematory Litig.*, *supra.* Little Rock is serviced by a national airport with routes to every corner of the country and has ample accommodations for business travelers. *See* Gregory Hansel, Extreme Litigation: *An Interview with Judge Wm. Terrell Hodges, Chairman of the Judicial Panel on Multidistrict Litigation*, *supra.* More specifically, and relevant to this litigation, there are direct flights from Los Angeles, California and New York, New York into Little Rock's airport with connections to all major hubs, thereby making Little Rock easily accessible to all parties. The infrastructure is certainly in place to host this MDL. Regardless, remote access to hearings also allows for high participation by all parties involved without need for travel.

Moreover, the Eastern District of Arkansas has capable staff with a long history of successfully managing high-profile multidistrict litigations. *See, e.g.*, *In re Prempro Prods. Liab. Litig.*, 254 F.Supp. 2d 1366 (J.P.M.L. (2003), *In re: Profemur Hip Implant Products Liability Litigation*, MDL. No. 2949, and *In re: Prempro Products Liability Litigation*, MDL No. 1507. Specifically, United States District Judge James M. Moody, Jr., is an excellent jurist who can expertly preside over this litigation. Judge Moody has experience handling multi-faceted, high-profile cases and is knowledgeable about this litigation specifically having two of the five pending Actions currently before him. And although Judge Moody is new to MDL assignment, assigning this matter to Judge Moody will advance the Panel's interest in reaching out to newer judges and

expanding the judiciary's MDL experience. *See* U.S. Judicial Panel on Multidistrict Litigation, "Multidistrict Litigation Terminated through September 30, 2016," at 6-11. In short, Judge Moody is an excellent and capable choice for overseeing this litigation and advancing the Panel's interests in expanding both diversity and MDL experience.

The Eastern District of Arkansas docket also demonstrates that the court has the capacity to handle this litigation. For instance, the Eastern District of Arkansas reports that between December 31, 2023 and March 13, 2024, there are 280 civil cases pending and 51 criminal cases pending. Accordingly, the Eastern District of Arkansas is an alternative appropriate central location for consolidation.

## IV.     CONCLUSION

For the above-stated reasons, Movants respectfully request that the Panel transfer the Actions set forth on the attached Schedule and all subsequently filed tag-along cases for coordinated or consolidated pretrial proceedings in the United States District Court for the Western District of Missouri, or alternatively, to the United States District Court for the Eastern District of Arkansas.

Dated: March 14, 2024

Respectfully submitted,

*/s/ Tina M. Bullock*
Tina M. Bullock
Danielle Ward Mason
Breean "BW" Walas
**BULLOCK WARD MASON LLC**
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
Tel: (833) 296-5291
Tina@bmwlaw.com
Danielle@bmwlaw.com
Bwalas@bmwlaw.com

**HAUSFELD LLP**
Steven B. Rotman* MA Bar #558473
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel.: (617) 207-0600
Fax: (617) 830-8312
srotman@hausfeld.com

**NIGH GOLDENBERG RASO &
VAUGHN, PLLC**
Ashleigh Raso* MN Bar #0393353
60 S. 6th St., Ste. 2800
Minneapolis, MN 55402
T: 612-656-8002
Araso@Nighgoldenberg.com