**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JACLYN ANGELILLI, Individually and on behalf of D.G., a minor,<br><br>    Plaintiff,<br><br>        v.<br><br>ACTIVISION BLIZZARD, INC.; INFINITY WARD, INC.; TREYARCH CORP.; SLEDGEHAMMER GAMES, INC.; RAVEN SOFTWARE CORPORATION; MICROSOFT CORPORATION; EPIC GAMES, INC.; ROBLOX CORPORATION; WAR DRUM STUDIOS LLC d/b/a GROVE STREET GAMES; ROCKSTAR NORTH LIMITED; ROCKSTAR GAMES, INC.; TAKE-TWO INTERACTIVE SOFTWARE, INC.; SONY INTERACTIVE ENTERTAINMENT, LLC; NINTENDO OF AMERICA INC.; GOOGLE, LLC; and APPLE, INC.,<br><br>    Defendants. | Case No.: 1:23-cv-16566<br><br>Hon. Manish S. Shah |

**DEVELOPER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

**TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ......................................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

      A.      Video Games Are Expressive Media...................................................................3

      B.      Developer Defendants' Games. .........................................................................4

      C.      Plaintiff's Claimed Injuries................................................................................7

LEGAL STANDARD..................................................................................................................8

ARGUMENT ...............................................................................................................................8

I.      The First Amendment Bars Plaintiff's Claims................................................................8

      A.      Plaintiff's Claims Are Barred Because They Target Protected Expression..........9

      B.      Plaintiff's Attempts to Evade the First Amendment Fail....................................14

II.      Plaintiff's Claims Fail for Independent Reasons. ............................................................19

      A.      Plaintiff Fails to Allege Developer Defendants Caused D.G.'s Injuries. ...........19

      B.      Plaintiff Fails to State a Claim for Strict Product Liability. ...............................22

      C.      Plaintiff Fails to Allege a Legal Duty Actionable in Negligence. ......................26

      D.      Plaintiff's COPPA Claim Is Preempted.............................................................28

      E.      Plaintiff Has Not Adequately Pleaded Any of Their Fraud-Based Claims. .......31

      F.      Plaintiff Fails to Plausibly Allege Intentional Infliction of Emotional Distress................................................................................................................33

      G.      Plaintiff Fails to State a Civil Conspiracy or In-Concert Liability Claim. .........35

CONCLUSION............................................................................................................................36

i

## TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ............................................................................................ 9, 15

*AAVN, Inc. v. WestPoint Home, Inc.*,
2019 WL 1168102 (N.D. Ill. Mar. 13, 2019) ........................................................ 31

*Abbasi ex rel. Abbasi v. Paraskevoulakos*,
187 Ill. 2d 386 (1999) .......................................................................................... 28

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ................................................................................ 17

*Aharon v. Babu*,
2023 WL 2214429 (N.D. Ill. Feb. 24, 2023) ........................................................ 30

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
499 F.3d 663 (7th Cir. 2007) ................................................................................ 20

*Am. Amusement Mach. Ass'n v. Kendrick*,
244 F.3d 572 (7th Cir. 2001) ..................................................................... 10, 14, 23

*Am. Booksellers Ass'n, Inc. v. Hudnut*,
771 F.2d 323 (7th Cir. 1985) ................................................................................ 13

*Anast v. Commonwealth Apartments*,
956 F. Supp. 792 (N.D. Ill. 1997) ........................................................................ 32

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) .................................................................................. 8

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) .............................................................................. 17

*Anderson v. Farmers Hybrid Companies, Inc.*,
408 N.E.2d 1194 (Ill. App. Ct. 1980) ............................................................... 23, 24

*Andrade v. Gen. Motors Corp.*,
785 N.E.2d 214 (Ill. App. Ct. 2003) ...................................................................... 26

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008) ................................................................................ 36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................. 8

*Bannon v. Univ. of Chicago*,
    503 F.3d 623 (7th Cir. 2007) ............................................................................ 34

*Barmapov v. Amuial*,
    2018 WL 11267365 (S.D. Fla. Dec. 12, 2018).................................................. 20

*Bier v. Leanna Lakeside Prop. Ass'n*,
    711 N.E.2d 773 (Ill. App. Ct. 1999) ................................................................. 30

*Bill v. Super. Ct.*,
    137 Cal. App. 3d 1002 (1982) ..................................................................... 16, 18

*Blue v. Env't Eng'g, Inc.*,
    215 Ill. 2d 78 (2005) ......................................................................................... 22

*Borsellino v. Goldman Sachs Grp., Inc.*,
    477 F.3d 502 (7th Cir. 2007) ....................................................................... 31, 35

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011)..................................................................................... passim

*Buckley v. Valeo*,
    424 U.S. 1 (1976)............................................................................................... 17

*Butler v. Michigan*,
    352 U.S. 380 (1957)........................................................................................... 19

*Calles v. Scripto-Tokai Corp.*,
    224 Ill. 2d 247 (2007) ....................................................................................... 22

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
    761 F.3d 732 (7th Cir. 2014) .............................................................................. 8

*Castaneda v. Amazon.com, Inc.*,
    2023 WL 4181275 (N.D. Ill. June 26, 2023)..................................................... 31

*Cent. States Joint Bd. v. Cont'l Assur. Co.*,
    453 N.E.2d 932 (Ill. App. Ct. 1983) .................................................................. 33

*City of Chicago v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004).......................................................................... 19, 20

iii

*Clay Fin. LLC v. Mandell*,
2017 WL 3581142 (N.D. Ill. Aug. 18, 2017) .................................................................. 36

*Cozzi v. N. Palos Elementary Sch. Dist. No. 117*,
597 N.E.2d 683 (Ill. App. Ct. 1992) ............................................................................... 26

*Destfino v. Kennedy*,
2009 WL 63566 (E.D. Cal. Jan. 8, 2009) ....................................................................... 20

*Destfino v. Reiswig*,
630 F.3d 952 (9th Cir. 2011) .......................................................................................... 20

*Doe v. Dilling*,
861 N.E.2d 1052 (Ill. App. Ct. 2006) ............................................................................. 32

*Duffy v. Orlan Brook Condo. Owners' Ass'n*,
981 N.E.2d 1069 (Ill. App. Ct. 2012) ............................................................................. 34

*English Co. v. Northwest Envirocon, Inc.*,
663 N.E.2d 448 (Ill. App. Ct. 1996) ............................................................................... 22

*Ent. Software Ass'n v. Blagojevich*,
404 F. Supp. 2d 1051 (N.D. Ill. 2005) ........................................................................ 1, 15

*Ent. Software Ass'n v. Granholm*,
426 F. Supp. 2d 646 (E.D. Mich. 2006) .......................................................................... 10

*Ent. Software Ass'n v. Swanson*,
519 F.3d 768 (8th Cir. 2008) .......................................................................................... 10

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ........................................................................................................ 15

*Estate of B.H. v. Netflix, Inc.*,
2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ......................................................... 15, 16, 23

*Exelon Corp. v. Dep't of Revenue*,
917 N.E.2d 899 (Ill. 2009) .......................................................................................... 22, 24

*Fox Assocs, Inc. v. Robert Half Int'l, Inc.*,
777 N.E.2d 603 (Ill. App. Ct. 2002) ............................................................................... 31

*Gandhi v. Sitara Cap. Mgmt., LLC*,
689 F. Supp. 2d 1004 (N.D. Ill. 2010) ............................................................................ 32

*Gillespie Cmty. Unit Sch. Dist. No. 7, Macoupin Cnty. v. Union Pac. R. Co.*,
43 N.E.3d 1155 (Ill. Ct. App. 2015) ...................................................................... 28

*Gorran v. Atkins Nutritionals, Inc.*,
464 F. Supp. 2d 315 (S.D.N.Y. 2006)............................................................... 24, 25

*H.K. through Farwell v. Google LLC*,
595 F. Supp. 3d 702 (C.D. Ill. 2022) .................................................................... 30

*Hasbun v. United States*,
941 F. Supp. 2d 1011 (N.D. Ill. 2013) ................................................................... 27

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) ................................................................................ 17

*Herceg v. Hustler Mag., Inc.*,
565 F. Supp. 802 (S.D. Tex. 1983)........................................................................ 27

*Herceg v. Hustler Mag., Inc.*,
814 F.2d 1017 (5th Cir. 1987) .............................................................................. 19

*Herrera v. Di Meo Bros., Inc.*,
529 F. Supp. 3d 819 (N.D. Ill. 2021) ................................................................... 34

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988)............................................................................................... 15

*Hutchison v. Fitzgerald Equip. Co., Inc.*,
910 F.3d 1016 (7th Cir. 2018) .............................................................................. 35

*In re Blackbaud, Inc., Customer Data Breach Litigation*,
567 F. Supp. 3d 667 (D.S.C. 2021)........................................................................ 29

*In re Boeing 737 MAX Pilots Litig.*,
638 F. Supp. 3d 838 (N.D. Ill. 2022) .................................................................... 19

*In re iPhone Application Litig.*,
2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ........................................................ 20

*In re VTech Data Breach Litig.*,
2018 WL 1863953 (N.D. Ill. Apr. 18, 2018) .......................................................... 30

*Indeck N. Am. Power Fund, L.P. v. Norweb, P.L.C.*,
735 N.E.2d 649 (Ill. App. Ct. 2000) ..................................................................... 35

*Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*,
 329 F.3d 954 (8th Cir. 2003) ............................................................................... 9, 10

*J&B Tankers, Inc. v. Navistar Int'l Corp.*,
 539 F. Supp. 3d 955 (E.D. Ark. 2021) .................................................................... 19

*Jackson v. Airbnb, Inc.*,
 639 F. Supp. 3d 994 (C.D. Cal. 2022) ..................................................................... 25

*James v. Meow Media, Inc.*,
 300 F.3d 683 (6th Cir. 2002) ................................................................ 9, 13, 23, 25

*Joe Hand Promotions, Inc. v. Lynch*,
 822 F. Supp. 2d 803 (N.D. Ill. 2011) ...................................................................... 22

*Jones v. Google LLC*,
 73 F.4th 636 (9th Cir. 2023) .................................................................................... 29

*Jones v. J.B. Lippincott Co.*,
 694 F. Supp. 1216 (D. Md. 1988) ....................................................................... 24, 25

*Jones v. Microsoft Corp.*,
 649 F. Supp. 3d 679 (N.D. Ill. 2023) ...................................................................... 28

*Joseph Burstyn, Inc. v. Wilson*,
 343 U.S. 495 (1952) ........................................................................................... 17, 19

*Kenebrew v. Connecticut Gen. Life Ins. Co.*,
 882 F. Supp. 749 (N.D. Ill. 1995) ........................................................................... 22

*Lewis v. Cotton*,
 932 F. Supp. 1116 (N.D. Ill. 1996) .......................................................................... 35

*Lowe v. S.E.C.*,
 472 U.S. 181 (1985) .................................................................................................. 19

*Manigault-Johnson v. Google, LLC*,
 2019 WL 3006646 (D.S.C. 2019) ............................................................................ 29

*McCarthy v. Fuller*,
 810 F.3d 456 (7th Cir. 2015) ................................................................................... 13

*McCollum v. CBS, Inc.*,
 202 Cal. App. 3d 989 (1988) ................................................................................... 28

vi

*McCready v. eBay, Inc.*,
   453 F.3d 882 (7th Cir. 2006) ........................................................................ 4

*Milford v. Com. Carriers, Inc.*,
   210 F. Supp. 2d 987 (N.D. Ill. 2002) ........................................................ 25

*Miner v. Fashion Enterprises, Inc.*,
   794 N.E.2d 902 (Ill. App. Ct. 2003) .......................................................... 33

*Minn. Comm'r of Rev.*,
   460 U.S. 575 (1983).................................................................................... 17

*Mitchell v. Archibald & Kendall, Inc.*,
   573 F.2d 429 (7th Cir. 1978) ...................................................................... 27

*Mullen v. GLV, Inc.*,
   488 F. Supp. 3d 695 (N.D. Ill. 2020) ......................................................... 33

*Near v. Minnesota*,
   283 U.S. 697 (1931).................................................................................... 16

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976).................................................................................... 13

*NetChoice, LLC v. Griffin*,
   2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).................................... 13, 15

*Neumann v. Borg-Warner Morse Tec LLC*,
   168 F. Supp. 3d 1116 (N.D. Ill. 2016) ....................................................... 27

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)........................................................................... 9, 13, 14

*Olivia N. v. N.B.C.*,
   126 Cal. App. 3d 488 (1981) ...................................................................... 18

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2024) ...................................................................... 19

*Organization for a Better Austin v. Keefe*,
   402 U.S. 415 (1971).................................................................................... 13

*Page v. Blank*,
   634 N.E.2d 1194 (Ill. App. Ct. 1994) ......................................................... 27

*Parham v. J.R.*,
  442 U.S. 584 (1979) .................................................................................................. 21

*Pelman v. McDonald's Corp.*,
  237 F. Supp. 2d 512 (S.D.N.Y. 2003) ....................................................................... 21

*Peterson v. Wexford Health Sources, Inc.*,
  986 F.3d 746 (7th Cir. 2021) ...................................................................................... 8

*PharMerica Chicago, Inc. v. Meisels*,
  772 F. Supp. 2d 938 (N.D. Ill. 2011) ....................................................................... 32

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) .................................................................................... 31

*Quinteros v. InnoGames*,
  2020 WL 3574268 (W.D. Wash. July 1, 2020) ......................................................... 35

*Quinteros v. InnoGames*,
  2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ........................................................ 23

*Quinteros v. InnoGames*,
  2024 WL 132241 (9th Cir. Jan. 8, 2024) .................................................................. 26

*Ramos v. Town of Vernon*,
  353 F.3d 171 (2d Cir. 2003) ....................................................................................... 21

*Reilly ex rel. Reilly v. Wyeth*,
  876 N.E.2d 740 (Ill. App. Ct. 2007) .......................................................................... 34

*Roberson ex rel. Roberson v. Novartis Pharms. Corp.*,
  2011 WL 1740137 (N.D. Ill. May 5, 2011) ............................................................... 28

*Rocha v. Rudd*,
  826 F.3d 905 (7th Cir. 2016) .................................................................................... 33

*Rodgers v. Christie*,
  795 F. App'x 878 (3d Cir. 2020) ............................................................................... 24

*Rogers v. Reagan*,
  823 N.E.2d 1016 (Ill. App. Ct. 2005) ....................................................................... 36

*Sanders v. Acclaim Ent., Inc.*,
  188 F. Supp. 2d 1264 (D. Colo. 2002) ................................................................. passim

viii

*Sheridan v. iHeartMedia, Inc.*,
　255 F. Supp. 3d 767 (N.D. Ill. 2017) ...................................................................... 22

*Simmons v. Campion*,
　991 N.E.2d 924 (Ill. 2013) ................................................................................... 31

*Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*,
　502 U.S. 105 (1991) ............................................................................................ 17

*Snyder v. Phelps*,
　562 U.S. 443 (2011) ......................................................................................... 8, 15

*Sorrell v. IMS Health Inc.*,
　564 U.S. 552 (2011) ................................................................................. 2, 12, 15

*T.K. ex rel. Leshore v. Bytedance Tech. Co.*,
　2022 WL 888943 (N.D. Ill. Mar. 25, 2022) .......................................................... 29

*Taliani v. Resurreccion*,
　115 N.E.3d 1245 (Ill. App. Ct. 2018) ............................................................. 34, 35

*Telescope Media Grp. v. Lucero*,
　936 F.3d 740 (8th Cir. 2019) ............................................................................... 16

*Tenan v. StrategIQ Commerce, LLC*,
　364 F. Supp. 3d 910 (N.D. Ill. 2019) ................................................................... 22

*Tobey v. Chibucos*,
　890 F.3d 634 (7th Cir. 2018) ................................................................................. 8

*Trahanas v. Nw. Univ.*,
　64 F.4th 842 (7th Cir. 2023) ................................................................................ 34

*Troxel v. Granville*,
　530 U.S. 57 (2000) .............................................................................................. 21

*Ulm v. Mem'l Med. Ctr.*,
　964 N.E.2d 632 (Ill. App. Ct. 2012) ..................................................................... 34

*Vesely v. Armslist LLC*,
　762 F.3d 661 (7th Cir. 2014) ............................................................................... 27

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
　20 F.3d 771 (7th Cir. 1994) ........................................................................... 20, 31

*Video Software Dealers Ass'n v. Schwarzenegger*,
  556 F.3d 950 (9th Cir. 2009) ................................................................ 10

*VIRAG, S.R.L. v. Sony Computer Ent. Am. LLC*,
  699 F. App'x 667 (9th Cir. 2017) ......................................................... 17

*Waller v. Osbourne*,
  763 F. Supp. 1144 (M.D. Ga. 1991) ...................................................... 19

*Watters v. TSR, Inc.*,
  715 F. Supp. 819 (W.D. Ky. 1989) ................................................... passim

*Watters v. TSR, Inc.*,
  904 F.2d 378 (6th Cir. 1990) ........................................................... 27, 28

*Wigod v. Wells Fargo Bank, N.A.*,
  673 F.3d 547 (7th Cir. 2012) ................................................................ 32

*Wilson v. Midway Games, Inc.*,
  198 F. Supp. 2d 167 (D. Conn. 2002) ............................................... passim

*Winter v. G.P. Putnam's Sons*,
  938 F.2d 1033 (9th Cir. 1991) .............................................................. 24

*Wright v. Assoc. Ins. Cos. Inc.*,
  29 F.3d 1244 (7th Cir. 1994) ................................................................ 21

*You v. Japan*,
  2015 WL 6689398 (N.D. Cal. Nov. 3, 2015) ........................................ 33

*Zamora v. C.B.S.*,
  480 F. Supp. 199 (S.D. Fla. 1979) .......................................... 14, 16, 19, 27

*ZL Techs., Inc. v. Gartner Grp., Inc.*,
  433 F. App'x 547 (9th Cir. 2011) ......................................................... 36

**Statutes**

15 U.S.C. § 6501 ..................................................................................... 28

15 U.S.C. § 6502(d) ................................................................................ 29

740 ILCS § 14/1 ...................................................................................... 28

815 ILCS § 505/1 ...................................................................................... 8

815 ILCS § 510/1 ...................................................................................... 8

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................... 3, 8, 20, 30, 31

**Other Authorities**

Restatement (Third) of Torts: Prod. Liab. § 19 (1998)...................................................... 22, 24, 25

**INTRODUCTION**

This case is an attack on the First Amendment rights of video game creators—rights protected by settled law. [1] Less than 15 years ago, the Supreme Court held that the First Amendment protects video games—complex, creative works that "communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)." *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 790 (2011). Consequently, *Brown* held, the First Amendment forbids the censorship of video games "solely to protect the young from ideas or images" that some consider "unsuitable[.]" *Id.* at 795.

Despite this, Plaintiff seeks to impose the very sort of restrictions *Brown* rejected, this time on the basis that video games are "addictive." But the First Amendment prohibits this attempted assault on protected expression. "If controlling access to allegedly 'dangerous' speech is important in promoting the positive psychological development of children, in our society that role is properly accorded to parents and families, not the State." *Ent. Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1075 (N.D. Ill. 2005), *aff'd*, 469 F.3d 641 (7th Cir. 2006). Plaintiff's lawsuit— one of several filed nearly simultaneously by the same attorneys—is barred for several reasons:

*First*, the First Amendment forecloses this suit. Each of Developer Defendants' games— *Fortnite*, *Call of Duty*, and *Grand Theft Auto V*—has become a critical success because of its unique and innovative art style, mechanics, game modes, and content. These games, like others,

---

[1] Defendants Activision Blizzard, Inc., Infinity Ward, Inc., Treyarch Corp., Sledgehammer Games, Inc., Raven Software Corporation (together, "Activision"), Epic Games, Inc. ("Epic"), Rockstar Games UK Ltd. (erroneously named as Rockstar North Limited), Rockstar Games, Inc., and Take-Two Interactive Software, Inc. (together, the "Rockstar Defendants") (collectively, "Developer Defendants") file this brief in support of their motion to dismiss the Complaint. Developer Defendants have each filed a motion to enforce their respective arbitration agreements. They join this brief in the alternative. All defendants moving to compel arbitration do not waive, and specifically assert, their rights under their respective arbitration agreements, including any appellate rights to have the proper forum resolved before any claims proceed on the merits.

1

are a place for people to build worlds, hone skills, socialize, compete, and more. They are "as much entitled to the protection of free speech as the best of literature." *Brown*, 564 U.S. at 796 n.4.

Plaintiff cannot escape this conclusion by pointing to the purported psychological effects of video games on children, *see* Complaint ("Compl.") ¶¶ 245-263 (ECF No. 1), or by targeting specific game features. The video game laws of the early 2000s—what the Supreme Court ultimately rejected in *Brown*—involved materially indistinguishable claims and studies about child psychology that Plaintiff brings here. And the features Plaintiff complains about make creative works more available, personalized, and challenging. That Plaintiff finds the expression in games "too persuasive" or "catchy"—i.e., too entertaining—"does not permit [them] to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011).

*Second,* the Complaint is devoid of allegations suggesting that Developer Defendants' video games proximately caused D.G. any harm. Plaintiff fails to allege even basic facts like when D.G. began playing the games at issue; how frequently they play them; or what features supposedly harmed them. This, too, bars Plaintiff's lawsuit.

*Third*, the product-liability claims fail because video games are expressive works, not "tangible" objects to which product liability law applies. Even if they were "products," Plaintiff cannot allege the games—which millions play without incident—are "unreasonably dangerous."

*Fourth*, the negligence claims fail because Plaintiff cannot plausibly allege facts establishing that Developer Defendants owed Plaintiff a duty. Content creators have no legal duty in tort to safeguard their audiences from harms allegedly caused by consuming their content. A different rule would stifle protected expression.

*Fifth*, the negligence per se claim predicated on the Children's Online Privacy Protection Act ("COPPA") fails because COPPA express preempts private rights of action.

2

*Sixth*, the fraud claims are not pleaded with particularity, as Rule 9(b) requires. The Complaint lacks *any* non-conclusory allegations identifying the statements Plaintiff claims are false, much less how they are false or that Developer Defendants knew they were false. Nor does Plaintiff allege facts sufficient to show these defendants concealed the alleged "psychological tricks" in their games. *E.g.*, Compl. ¶ 507. And even the single alleged misrepresentation Plaintiff vaguely identifies—*Fortnite* is "educational"—is a non-actionable statement of opinion. *Id.* ¶ 310.

*Seventh*, the remaining claims for intentional infliction of emotional distress, civil conspiracy, and in-concert liability fail. The Complaint does not plausibly allege that Developer Defendants intended to cause distress or that their creation and dissemination of games was so "utterly outrageous" that it "has no place in civilized society." Plaintiff offers no facts to show any coordination between Developer Defendants to support a conspiratorial scheme.

Plaintiff's lawsuit is just one in a long line of failed efforts to hold creators liable for the purported effect of protected expression on children. These efforts have touched almost every conceivable form of speech. And they have uniformly failed. Permitting Plaintiff to proceed would contravene decades of First Amendment jurisprudence and raise the chilling specter of liability for any expressive medium that poses some theoretical risks from overconsumption—whether that be "binge watching" Netflix, spending late nights immersed in a Harry Potter book, or playing Taylor Swift on repeat. The Court should dismiss the Complaint with prejudice.

**STATEMENT OF FACTS**

**A.      Video Games Are Expressive Media.**

More than two-thirds of Americans play video games. Compl. ¶ 220. Developments in technology have enabled the creation of games with "a staggering amount of content" and incredible complexity, "[f]rom open-world games with hundreds of square miles to explore to role

3

playing games ('RPGs') that can take hundreds of hours" to complete. *Id.* ¶ 99. Developers create "more game content" to keep players "challenge[d] throughout a game," *id.* ¶¶ 187, 192, publishing "engaging and fresh features" like "new maps" and other design elements, *id.* ¶ 304.

Not all video games are created for children. Just as parents may supervise their children's consumption of books, movies, and television, parents have tools to manage the video games their kids play. For example, the private association Entertainment Software Rating Board ("ESRB") assigns age and content ratings to video games, *id.* ¶ 64,[2] creating a rating system under which "the video game industry outpaces the movie and music industries," ensuring "that parents who care about the matter can readily evaluate the games their children" play. *Brown*, 564 U.S. at 803.

**B.       Developer Defendants' Games.**

Plaintiff identifies several games that D.G. allegedly played, Compl. ¶ 29, including:

*Fortnite***.** Published in 2017 and developed by Epic, *Fortnite* has several game modes, including three Plaintiff has identified. *Fortnite: Battle Royale* is a "free-to-play battle royale game in which up to 100 players fight to be the last person standing," where players must "scavenge for weapons, items, resources, and vehicles," *id*. ¶ 278. *Fortnite: Save the World* is a "cooperative hybrid tower defense and survival game in which up to four players fight off zombie-like creatures and defend objects with traps and fortifications." *Id*. ¶ 279. And *Fortnite Creative* gives players "complete freedom to create worlds" of their own choosing. *Id*. ¶ 280. Players can also tailor the *Fortnite* experience to their liking, having the freedom to play alone or to team up with friends in

---

[2] *See* ESRB, https://www.esrb.org/ (allowing users to search game ratings by game title). The Court can consider ESRB's ratings of the games that D.G. plays in evaluating this motion to dismiss because the Complaint references ESRB as a regulatory body focused on video games, Compl. ¶ 94, and refers to the ESRB rating of at least one of the games, *see id.* ¶ 282 ("Battle Royale and Save the World are rated T for Teen—*i.e.*, recommended for individuals aged 13 and above."). *See, e.g.*, *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) ("documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim" (cleaned up)).

a "duo" or a "squad." *Id*. ¶ 278. The ESRB has rated *Fortnite*'s *Battle Royale* and *Save the World* "T" for "teen," meaning they are "recommended for individuals aged 13 and above." *Id*. ¶ 282.

*Fortnite* has a captivating design that features attention-grabbing "bright and vibrant colors" and "cartoonish" animation. *Id*. ¶ 302. To avoid creating a "bleak multiplayer" game, *Fortnite*'s storyline is "inject[ed]" with "elements of variety." *Id*. ¶ 302-303. That includes encouraging players "to find ideal hiding spots" and "loot drops," to "explore the entire [game's] map," and to "us[e] resources" to "build towers," "forts," and any other structure a player can imagine. *Id*. ¶ 303. And, since Epic innovates continuously, it routinely "rolls out updates" to *Fortnite*, introducing "engaging [] fresh features, new maps, live events, and the latest trends." *Id*. ¶ 304. Like any compelling form of entertainment, Epic endeavors for players to "never get bored while playing" *Fortnite*. *Id*. ¶ 303. Adding to *Fortnite*'s creativity are V-bucks—an "in game currency" that players use to buy a variety of items that make the in-game universe more visually exciting. *Id*. ¶ 287. While players can "purchase[]" V-bucks with "real-world funds," but do not have to, many "earn[]" V-bucks by "completing missions and other achievements." *Id*.

Building a world of *Fortnite*'s intricacy required an intense, yearslong collaboration among visual artists, writers, actors, musicians, programmers, developers, "statisticians, analysts," production "coordinators" and many more. *Id*. ¶ 295. The creativity and effort Epic applied to achieve that goal have led to wild success: as of the commencement of this action, "*Fortnite* has an average of 239 million monthly players and a peak of 15 million players in a day." *Id.* ¶ 290.

**Call of Duty.** Developed by Activision, *Call of Duty* is the most successful video game franchise created in the United States.[3] *Id.* ¶ 345. Since 2003, *Call of Duty* has allowed players to experience incredibly raw, gritty, and provocative narratives across nearly two dozen different

---

[3] Microsoft acquired Defendant Activision Blizzard, Inc. in October 2023. Compl. ¶ 67.

versions of the game, each featuring different stories, abilities, and settings. *Id.* ¶¶ 344, 347, 343 n.14. *Call of Duty* can be played in single-player or multiplayer modes. *Id.* ¶ 353. As with any engaging game, *Call of Duty* allows players to complete levels and obtain rewards. *Id.* ¶¶ 355, 361, 343 n.14. And in the same way that musical artists will often sell a deluxe version of their albums with songs that were not included on the standard track list, *Call of Duty* allows players to purchase additional levels in order to play different content. *Id.* ¶ 368 n.15. The ESRB has rated *Call of Duty* "M" for "mature," meaning it is recommended for people 17 and older.[4]

**Grand Theft Auto V.** The Rockstar Defendants' *Grand Theft Auto V* is an "action-adventure" game released in 2013, and is the "second best-selling video game of all time." *Id.* ¶¶ 381, 387. *Grand Theft Auto V* is a cinematic experience that "centers on a [] protagonist who attempts to rise through the criminal underworld due to various motives, often accompanying themes of betrayal," *id.* ¶ 389, and includes appearances by "several film and music celebrities," *id.* ¶ 390. *Grand Theft Auto V* is set within a large-scale fictional, virtual world (the city of San Andreas) and allows "players [to] complete missions to progress an overall story, as well as engage in various side activities." *Id.* ¶ 381.

Plaintiff alleges that the game paints "a captivating storyline," *id.* ¶ 391; offers "endless arrays of activities and challenges to continually engage users and ensure they are never bored," such as "skydiving, playing darts, watching movies, and even arm wrestling," *id.* ¶ 392; has "good graphics" and "smooth and predictable controls," *id.* ¶ 391; allows players to compete against others or play with friends, *id.* ¶ 398; "gives players a chance to 'drive' their dream car[s]" that feature "speedy performance and crisp controls," *id.* ¶ 393; allows players to acquire items for their character like clothing and accessories, with in-game currency that is either earned by

---

[4] *Call of Duty*, ESRB, *available at* https://www.esrb.org/search/?searchKeyword=call+of+duty. The Court can consider ESRB's ratings of the games D.G. plays in evaluating this motion to dismiss. *See infra* note 2.

completing objectives in the game or purchased using real money, *id.* ¶ 399; and provides players with free additional content to keep the game interesting, *id.* ¶ 401. Plaintiff claims that these "features" together (i.e., the game's compelling ***content***) is what makes the game "addictive." *Grand Theft Auto V* is rated "M"—for people 17 and older.[5]

### C. Plaintiff's Claimed Injuries.

Although Plaintiff alleges "more clinical research" and "further study" are needed to decide whether to create a medical diagnosis for video game addiction, *see id.* ¶ 227, she nevertheless contends D.G. is addicted to video games, *see, e.g.*, *id.* ¶ 264, and that Developer Defendants are responsible based on expressive aspects of the games, including, for example:

- "[A]dd[ing] more game content over time" and "maintaining a consistent level of challenge throughout a game," *id.* ¶¶ 187, 192.

- "[R]ewards, bright and vibra[nt] colors, and continual gameplay variety," *id.* ¶ 507.

- "[C]ontinuously adding new game content." *Id.* ¶ 174.

- "[E]ngaging and fresh features, new maps, live events, and the latest trends." *Id.* ¶ 304.

Plaintiff also claims D.G. suffers from attention deficit hyperactivity disorder ("ADHD"), depression, anxiety, and other ailments, and has spent "hundreds of dollars" on unidentified in-game transactions and downloadable content. *Id.* ¶¶ 269-271. D.G.'s parent, Plaintiff Jaclyn Angelilli, alleges that D.G.'s gaming has caused her "emotional distress, mental anguish, pain, suffering" and "financial[] damage[]." *Id.* ¶ 272.

Plaintiff asserts claims in strict product liability for defective design, failure to warn, and failure to instruct (Counts I, II, III); negligence (Counts IV, V, VI, VIII, IX, XI, XVII); negligence per se premised on violations of COPPA and other statutes (Count VII); intentional infliction of

---

[5] *See Grand Theft Auto V*, ESRB, *available at* https://www.esrb.org/ratings/33073/grand-theft-auto-v/.

emotional distress (Count X); violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("Consumer Fraud Act")[6] and the Illinois Uniform Deceptive Trade Practices Act ("Deceptive Practices Act")[7] (Counts XII and XIII); fraudulent misrepresentation (Count XIV); fraudulent misrepresentation and concealment (Count XV); fraudulent inducement (XVI); civil conspiracy (XVIII); and in-concert liability (Count XIX). *See id.* ¶¶ 708-920.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Tobey v. Chibucos*, 890 F.3d 634, 639 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (7th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

A heightened pleading standard applies to claims that sound in fraud, *see* Fed. R. Civ. P. 9(b), *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736-37 (7th Cir. 2014), requiring a plaintiff to plead "the who, what, when, where, and how of the fraud," *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (internal citations omitted).

## ARGUMENT

**I.      The First Amendment Bars Plaintiff's Claims.**

The First Amendment prohibits imposing civil liability on the creation and dissemination of constitutionally protected speech. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011). This bar is

---

[6] For ease of reference, Defendants refer to 815 ILCS § 505/1 *et seq.* as the "Consumer Fraud Act."
[7] For ease of reference, Defendants refer to 815 ILCS § 510/1 *et seq.* as the "Deceptive Practices Act."

absolute, as courts "cannot adequately exercise [their] responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability." *James v. Meow Media, Inc.*, 300 F.3d 683, 697 (6th Cir. 2002).

Plaintiff seeks to hold Developer Defendants liable for creating and publishing speech—video game content—that the Supreme Court has held fully protected by the First Amendment. *Brown*, 564 U.S. at 790. Courts have repeatedly dismissed claims against video game makers for their games' supposed harm to minors. Plaintiff cannot recast her claims as challenging how Developer Defendants "design" or present video game content, as the First Amendment protects such creative choices and game features. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023); *see also Brown*, 564 U.S. at 790. Nor may Plaintiff hold Developer Defendants liable by repackaging her allegations in fraud, as those claims still fundamentally are premised on expressive choices. The Court should dismiss the claims now and with prejudice, as the "fear of damage awards" in cases targeting speech, *New York Times Co. v. Sullivan*, 376 U.S. 254, 277-78 (1964), can generate a "devastatingly broad chilling effect," *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990).

### A.    Plaintiff's Claims Are Barred Because They Target Protected Expression.

Video games express speech protected by the First Amendment. *Brown*, 564 U.S. at 790. Like other fictional works, games use "scripts and story boards," "storyline," "character development," "narrative," and "dialogue" to propel players through imagined universes. *Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 957 (8th Cir. 2003). And like other creative expression, games communicate ideas and stir emotions through "pictures, graphic design, concept art, sounds," and "music." *Id.* Video games also communicate through features that enable "interactive play," giving players "control" over content. *Id.* at 957-58. For

these reasons, several courts of appeals, and ultimately the Supreme Court, have held video games protected, with the Supreme Court finding that video games' "interactive" features, which are "distinctive to the medium," are protected even when they "draw[]" a player in and "invite[]" their attention. *Brown*, 564 U.S. at 790, 798 (quoting *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001), 244 F.3d at 577); *see also Interactive Digital Software Ass'n*, 329 F.3d at 956-58; *Ent. Software Ass'n v. Swanson*, 519 F.3d 768, 772 (8th Cir. 2008); *Am. Amusement Mach. Ass'n*, 244 F.3d at 577; *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786.

Plaintiff's claims fall neatly within this extensive precedent. They target "design strategies" and allegedly "defective features" that are forms of creative expression, which enable interactive play and are inseparable from a game's content. Compl. ¶¶ 162, 496. Just as a painter may convey meaning with a brushstroke, a filmmaker with a camera angle, or a poet with rhyme or meter, video game developers use "features distinctive to the medium" to communicate a game's ideas, themes, and messages. *Brown*, 564 U.S. at 790.

The Complaint's use of psychological jargon and disparaging labels does not alter the First Amendment analysis. Plaintiff cannot avoid the conclusion that her claims target these interactive features *precisely because of* both their expressive character and the video game content with which they are intertwined. *See, e.g.*, *Ent. Software Ass'n v. Granholm*, 426 F. Supp. 2d 646, 651 (E.D. Mich. 2006) (video game interactivity "enhance[s] the expressive elements even more than other media"). The Complaint faults Developer Defendants for "continuously adding new game content," Compl. ¶ 174, and "downloadable content" that "keep[] [players] hooked in the content and the game," *id.* ¶ 193. Just as screenwriters develop new seasons of television series, game designers create "engaging and fresh features" to entertain players. *Id.* ¶ 304.

10

Plaintiff complains that the games use so-called "rubber banding" and "feedback loops"—that is, the games tailor their difficulty to a player's skill. *See* Compl. ¶¶ 153, 179-188. A video game's power to "react[] to how well [a] player is doing" to provide "a consistently challenging experience" and prevent the player from becoming "bor[ed]," *id.* at ¶¶ 153, 179, 184, are "features distinctive to the medium," *Brown*, 564 U.S. at 790. When done well, this interactivity makes a game more fun, engaging the player and extending the expressive power of the medium.

The alleged problem, in other words, is that the expression is *too* "engaging." Compl. ¶ 304. These and other design elements—like "a 'near miss,' effect, random rewards, bright and vibra[nt] colors, and continual gameplay variety," "social aspects," "numerous characters," "satisfying graphics and sounds," and "exciting animation," *see*, *e.g.*, *id*. ¶¶ 130, 507, 741, 763—reflect literary and artistic choices that contribute to the "characters, dialogue, [and] plot" that in turn "communicate ideas" to the player. *Brown*, 564 U.S. at 790. Like cliffhangers that thrust the reader to the next chapter, or teasers on the front page of a magazine, they are protected expression.

The same is true for what the Complaint derides as "monetization schemes"—like "loot boxes," "microtransactions," and "pay-to-win" features that permit players to buy content like "shortcuts," "special characters," and "cosmetic items that can be used to customize characters or weapons." Compl. ¶¶ 141-42. These are aesthetic and competitive aspects of games that can make them more fun and immersive to players, much like the concert-goer who pays a premium for merchandise or backstage passes, or the theme park attendee who pays extra to bypass lines or meet characters. Game designers use the features at issue to invite players to "interact[] with the virtual world." *Brown*, 564 U.S. at 790. A player's power to customize their experience is "distinctive to the medium" of video games—and a core part of game design, which fosters imagination, creativity, and immersion. In *Fortnite*, for example, players can generate exciting and

11

fantastical matchups—such as an avatar dressed as Iron Man competing against another dressed as Luke Skywalker—which enhances the "bright and vibrant colors and cartoonish representation of the game." *Id.* ¶ 302. In *Call of Duty*, players can unlock weapon blueprints, operator skins, and even hand-pick soundtracks to cultivate their ideal battle atmospherics. *Id.* ¶¶ 369, 375. And in *Grand Theft Auto V*, players have the "chance to 'drive' their dream car" and can access "flashy cars, guns, and clothes," all of which accentuate and give added color to the player's "attempt[] to rise through the criminal underworld." *Id.* ¶¶ 389, 393, 399. These customization options, whether earned or paid for, are creative ways that developers curate a game's theme or atmosphere.

Not only are these design choices expressive themselves, but they also are inextricably intertwined with the other expressive content that they deliver and enhance. Simply offering "in-game purchases" generates no interest without attractive content. "Rubber banding," which shows a player certain content available for purchase that "match[] the player's desire and capacity to pay," Compl. ¶ 154, is meaningless unless the cosmetics are attractive. Thus, Plaintiff's claims that in-game content and particular gameplay elements make the games addictive attack the very expressive, artistic, and literary decisions that the First Amendment protects.

The First Amendment protects this expression no less than it protects the publication and "targeted" "dissemination" of other "catchy" media, *Sorrell*, 564 U.S. at 570, 578, from page-turner novels to binge-worthy television, *see Brown*, 564 U.S. at 798. "[A]ll literature is interactive" and "the better it is, the more interactive" and engaging it becomes. *Id.*; *see also id.* at 790 (First Amendment applies "whatever the challenges of applying the Constitution to ever-advancing technology" and irrespective of "esthetic" tastes). The claim that features designed to promote engagement lead to "too much" speech is incompatible with the First Amendment's aim to "secure the widest possible dissemination of information from diverse and antagonistic

sources." *N.Y. Times*, 376 U.S. at 266 (internal quotation marks omitted). Under the system of free expression our Constitution commands, "an idea is as powerful as the audience allows it to be." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 327-28 (7th Cir. 1985), *aff'd,* 475 U.S. 1001 (1986) (state could not ban pornography simply because of its "power" "as speech").

The threat of tort liability poses an even greater threat to speech than does the statutory liability considered in *Brown*, as game developers will, facing uncertainty in the law, become even more speech restrictive. *See James*, 300 F.3d at 697; *cf. NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *15 (W.D. Ark. Aug. 31, 2023) ("companies will err on the side of caution," which may "unnecessarily burden minors' access to constitutionally protected speech"). That threat is at its zenith where, as here, a lawsuit seeks not just damages but also such remedies as "enjoining online gaming access to minors," Compl. ¶¶ 796, 814. Such a sweeping prior restraint is the epitome of what the Supreme Court has termed "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Plaintiff cannot overcome the "heavy presumption" against the validity of such a restraint, *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (internal citation omitted), particularly given that the requested injunction "is so broad and vague" that it would enjoin lawful speech, *McCarthy v. Fuller*, 810 F.3d 456, 463 (7th Cir. 2015).

Recognizing these principles, courts have rejected attempts to hold creators liable in tort for allegedly "addictive" expression. In *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002), for example, the court dismissed claims that a teenager attacked the plaintiff's son because the game *Mortal Kombat* was "designed" to "cause the user to believe and physically feel" that he was "actually participating" in "violent battles." *Id.* at 169-71, 181-82 (dismissing product liability, negligence, loss of consortium, and unfair trade practices claims). The features that

13

allegedly gave the game its "addictive power," *id.* at 182, "enhance[d]" the game's "expressive and artistic" experience. *Id.* at 181; *see also, e.g.*, *Am. Amusement Machine Ass'n*, 244 F.3d at 577 (interactive nature of video games does not strip them of protection).

Likewise, in *Watters*, a court dismissed claims that a board game publisher negligently caused the plaintiff's son's suicide after the son became "totally absorbed by and consumed with the game to the point that he was incapable of separating the fantasies played out in the game from reality." 715 F. Supp. at 820. Because the "essence" of the plaintiff's suit sought to impose liability for "the content of the game," the First Amendment barred relief. *Id.* at 821-24.

And in *Zamora v. C.B.S.*, 480 F. Supp. 199 (S.D. Fla. 1979), the First Amendment barred a plaintiff's attempt to hold a television network liable for causing a minor to become "addicted to and completely subliminally intoxicated by extensive viewing of television violence." *Id.* at 200. The programming was protected speech, and the minor's "alleged response" could not be a basis to punish and thus "inhibit" (through civil liability) the network's expression or the public's right to receive it. *Id.* at 204, 205-06. *See also Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (dismissing claims by school shooting victims against violent video game publishers).

The same result should follow here. Plaintiff's effort, if successful, would create "hazards to protected freedoms" as great, if not "greater," "than those that attend" government regulation. *N.Y. Times*, 376 U.S. at 278. The Court should dismiss Plaintiff's claims with prejudice.

### B. Plaintiff's Attempts to Evade the First Amendment Fail.

Plaintiff cannot circumvent the First Amendment by disguising her claims as ordinary torts. The First Amendment's protections extend to content minors consume, allegedly harmful or addictive expression, actions taken to create expressive works, expression that generates revenue, and the alleged failure to warn that content is supposedly dangerous.

14

*Minors.* The fact that Plaintiff seeks to protect minors has no effect on the First Amendment analysis. "[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young" from "unsuitable" "ideas or images." *Brown*, 564 U.S. at 795 (internal quotation marks omitted); *see also NetChoice, LLC*, 2023 WL 5660155, at *15 (state cannot bar minors from seeing "potentially damaging or distressing" speech). There is no "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citations omitted); *accord Blagojevich*, 404 F. Supp. 2d at 1074-75 ("'[T]he priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it.' . . . These concerns apply to minors just as they apply to adults." (citation omitted)).

*Allegedly Harmful Speech.* Speech that is allegedly psychologically "harmful" or "addictive" is also no exception. "Speech remains protected even when it . . . 'inflict[s] great pain,'" *Sorrell*, 564 U.S. at 576 (quoting *Snyder*, 562 U.S. at 460-61), "anguish," or "incalculable grief." *303 Creative*, 600 U.S. at 586; *see also Snyder*, 562 U.S. at 456 (no liability for speech that inflicts severe emotional distress); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (First Amendment protects "outrageous" parody despite "adverse emotional impact"). Courts likewise dismiss claims premised on the attractiveness of content, as those claims, too, seek to punish the content of expression. *See, e.g.*, *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *2 n.3, 3 (N.D. Cal. Jan. 12, 2022) (dismissing claim that algorithms manipulated viewers "into watching content"; "[w]ithout the content, there would be no claim" (internal quotation marks omitted)), *aff'd on other grounds, sub nom. Est. of Herndon v. Netflix, Inc.*, 2024 WL 808797 (9th Cir. Feb.

27, 2024); *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1007 (1982) (barring claim that showing movie "attract[ed] violence" because it sought to "impose liability on the basis of the content of the motion picture"); *Midway Games*, 198 F. Supp. 2d at 170, 181-82 (similar); *Watters*, 715 F. Supp. at 821-24 (similar); *Zamora*, 480 F. Supp. at 204-06 (similar).

Ignoring this, Plaintiff effectively "ask[s] this Court to create new categories of unprotected speech"—this time for allegedly "addictive" video game content—"by applying a simple balancing test that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test." *Brown*, 564 U.S. at 792 (internal quotation marks omitted); *cf., e.g.*, Compl. ¶ 325 (benefits of video games "are outweighed by the negative aspects of addiction"). The Supreme Court has "emphatically rejected" that "startling and dangerous proposition," *Brown*, 564 U.S. at 792, and so, too, should this Court.

***Producing Expressive Works.*** Plaintiff cannot save her claims by characterizing the games as "products," conduct, or economic activity. *Near v. Minnesota*, 283 U.S. 697, 720 (1931); *see also infra* § II.B. "Speech is not conduct just because" someone "says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). The Eighth Circuit thus rejected an argument that "producing a video" is "conduct," explaining that, even though "producing a video requires several actions that, individually, might be mere conduct . . . what matters . . . is that these activities come together to produce finished videos that are media for the communication of ideas." *Id.* at 752 (internal quotation marks omitted); *see also Estate of B.H.*, 2022 WL 551701, at *3 (claims targeting acts to produce expression regulated speech not conduct).

This protection extends to features that enable users to create their own content. *See, e.g.*, *Brown*, 564 U.S. at 798 ("choose-your-own-adventure stories" protected). The First Amendment protects the provision of "integral" inputs that "*facilitate*[]" content creation, just as much as

16

expression itself. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595-97 (7th Cir. 2012) (citing *Buckley v. Valeo*, 424 U.S. 1, 19 (1976)) (cleaned up). The Supreme Court thus has rejected attempts to prevent authors from earning royalties, *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991), as well as taxes on newsprint and ink, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 582 (1983); *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (invalidating law banning tattoo parlors). Plaintiff can no more hold the Developer Defendants liable for providing tools to create video game content than they could hold an art studio liable for providing "brushes and canvas." *Id*. at 1061-62.

**Speech That Generates Revenue.** It also makes no difference that Developer Defendants earn revenue from video games. *Cf. id*. ¶ 111. Like revenue for newspapers and booksellers, "[m]icrotransactions are often used in free-to-play games to provide a revenue source for the developers and publishers." *Id.*; *see also id.* ¶¶ 116, 118, 123. The "[m]icrotransactions" Plaintiff challenges are simply opportunities for players to customize their in-game experience by purchasing more content, such as "cosmetic items" and a "tiered progression of customization rewards" in *Fortnite*; access to additional levels, soundtracks, and blueprints in *Call of Duty*; and a chance to "'drive' their dream car" and experience its "speedy performance and crisp controls" in *Grand Theft Auto V*. *E.g.*, Compl. ¶¶ 289, 369, 374, 393, 399. This does not diminish Developer Defendants' First Amendment rights. Just as the fact that "books, newspapers, and magazines" are published "for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment," video games remain protected even when they generate revenue. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) (film choices protected); *see also VIRAG, S.R.L. v. Sony Computer Ent. Am. LLC*, 699 F. App'x 667, 668 (9th Cir. 2017) (video games express noncommercial speech); *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 120 (5th

17

Cir. 1992) (recognizing protection for content "included to finance the publication").

***Failure to Warn.*** Plaintiff also cannot save her claims by casting them under the rubric of "failure to warn" or "failure to disclose," as courts have also held. In *Bill*, for example, the court affirmed dismissal of a claim that film producers did not warn filmgoers about the likelihood "that violence might occur at or near theatres." 137 Cal. App. 3d at 1006-07. The First Amendment barred this claim because if the film "tended to attract violence-prone persons to the vicinity of the theater, it is precisely because of the *film's content.*" *Id.* (emphasis added); *accord Watters*, 715 F. Supp. at 822 n.1 (publisher cannot "constitutionally be required to warn its readers of possible consequences of reading or playing the game materials."); *Olivia N. v. N.B.C.*, 126 Cal. App. 3d 488, 492 (1981) (First Amendment barred claims against broadcaster for showing violent film "without proper warning"); *Sanders*, 188 F. Supp. 2d at 1270 (same, where movie and video game distributors allegedly "failed to exercise reasonable care to inform consumers of the dangerous condition of their products and materials or of the facts which made their products and materials likely to be dangerous"). So too here. The First Amendment not only bars claims premised on the publication of video games, but also claims premised on an alleged failure to warn about them.

***Opinion Statements.*** Finally, Plaintiff cannot permissibly circumvent the First Amendment by repackaging her claims to sound in fraud (Counts XII-XIX). Those claims seek to hold Developer Defendants liable for the same alleged, expressive choices in "design[ing]" their games, *see*, *e.g.*, Compl. ¶¶ 659-662, 670, 822, 839, 877-878, 888, 908, and making them available to Plaintiff, *see*, *e.g.*, *id.* ¶¶ 854, 900. While the fraud-based claims gesture broadly to unidentified, allegedly misleading statements or omissions, none of these vague assertions take those claims beyond the ambit of the First Amendment. The only alleged Developer Defendant statement identified in the Complaint—that *Fortnite* is "educational," *id.* ¶¶ 310-312—is, at most, an

18

"expression of opinion about a commercial product" and thus is "protected by the First Amendment." *Lowe v. S.E.C.*, 472 U.S. 181, 210 n.58 (1985); *see also Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2024) (for-profit educational company's "use of general terms like 'educational content'" non-actionable puffery); *J&B Tankers, Inc. v. Navistar Int'l Corp.*, 539 F. Supp. 3d 955, 963 (E.D. Ark. 2021) (statements about engine's safety not actionable because they were "puffery, not false representation").

This lawsuit violates the First Amendment's "most basic" principle: "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91. And it is merely the latest effort to hold publishers liable for the design of allegedly harmful content. But from books, *e.g.*, *Butler v. Michigan*, 352 U.S. 380, 382 (1957), to magazines, *e.g.*, *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1023-24 (5th Cir. 1987), to board games, *e.g.*, *Watters*, 715 F. Supp. at 822, to television shows, *e.g.*, *Zamora*, 480 F. Supp. at 205-06, to movies, *e.g.*, *Burstyn*, 343 U.S. at 502, to rock music, *e.g.*, *Waller v. Osbourne*, 763 F. Supp. 1144, 1153 (M.D. Ga. 1991), *aff'd*, 958 F.2d 1084 (11th Cir. 1992)—and even to video games, *Brown*, 564 U.S. at 798-99—courts have rejected these claims. This Court should, too.

## II.     Plaintiff's Claims Fail for Independent Reasons.

The First Amendment bars all Plaintiff's claims, but the claims also fail under Illinois law.

### A.     Plaintiff Fails to Allege Developer Defendants Caused D.G.'s Injuries.

All of Plaintiff's claims must be dismissed because they fail to plead that any Developer Defendant—individually or together—proximately caused Plaintiff's alleged injuries. "Under Illinois law, 'the lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate [it] . . . .'" *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 851 (N.D. Ill. 2022) (quoting *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d

19

1099, 1128 (Ill. 2004)). "[P]roximate cause 'is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it.'" *Id.* at 853 (quoting *City of Chicago*, 821 N.E.2d at 1127). Thus, "[t]he greater the separation between the conduct and the injury, the less likely that proximate causation can bridge the gap." *Id*. In multi-defendant cases, "the complaint should inform each defendant of the nature of his alleged participation in the [wrongdoing]." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994). Courts routinely "reject[] complaints that . . . lump[] together multiple defendants." *Id*. (examining Rule 9(b)'s requirements); *see also see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007) (applying Rule 8).

Plaintiff's allegations about D.G.'s individual experience—comprising only 9 paragraphs of a 922-paragraph Complaint—boil down to the following: (1) D.G. plays *Fortnite*, *Call of Duty*, and *Grand Theft Auto*; (2) D.G. "has spent hundreds of dollars on in-game transactions and downloadable content"; and (3) D.G. has developed internet gaming disorder and other health conditions. *See* Compl. ¶¶ 264-272. Nowhere does Plaintiff identify when D.G. began playing each game, when they began suffering the alleged harms, or the features that D.G. used. These allegations fail to adequately allege causation. *See Destfino v. Kennedy*, 2009 WL 63566, at *5 (E.D. Cal. Jan. 8, 2009) (dismissing complaint when "plaintiffs allege that each [D]efendant did everything," making it "difficult if not impossible to determine which . . . conduct [is] attributed to any particular defendant"), *aff'd sub nom. Destfino v. Reiswig*, 630 F.3d 952 (9th Cir. 2011); *Barmapov v. Amuial*, 2018 WL 11267365, at *5 (S.D. Fla. Dec. 12, 2018) (same); *In re iPhone Application Litig.*, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011) (same).

Even if gaming disorder were a recognized medical condition (and it is not),[8] Plaintiff's

---

[8] Internet gaming disorder ("IGD") is not a widely accepted diagnosis in the United States. The Diagnostic

20

claims would still fail because she has not pleaded adequately that gaming was the cause of, rather than a symptom of or coping mechanism for, D.G.'s various other alleged ailments. Compl. ¶ 20. As the APA explains, "gaming could be a symptom of an underlying problem, such as depression or anxiety, and not a disorder or addiction itself." APA, *Internet Gaming*.[9]

Finally, Plaintiff cannot plausibly plead proximate cause given the intervening and judicially recognized supremacy of parental decision making. "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Parents and guardians generally are allowed to decide, or at least influence, how much time a minor may spend on games, whether to give him access to a credit card for gaming purchases, and whether to allow video games in the home at all. *See Ramos v. Town of Vernon*, 353 F.3d 171, 183 (2d Cir. 2003) ("'[B]etween parents and judges, the parents should be the ones to choose whether to expose their children to certain people or ideas.'" (quoting *Troxel v. Granville*, 530 U.S. 57, 63 (2000)). For that reason, courts dismiss tort claims when parental decisions undermine causation. *See, e.g.*, *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 533 (S.D.N.Y. 2003) (dismissing claim against McDonalds because "[p]laintiffs have failed to allege . . . their decisions to eat at McDonalds several times a week were anything but a choice

---

and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, "recognizes gaming disorder as a condition *for further study*." Compl. ¶ 227 (emphasis added). The American Psychiatric Association ("APA") explains that "[w]hether internet gaming should be classified as an addiction/mental disorder is the subject of much debate and a growing body of research." APA, Internet Gaming, https://www.psychiatry.org/patients-families/internet-gaming (last visited March 28, 2024) ["APA, Internet Gaming"]. The APA further notes that "there is an important distinction between passionate engagement (someone enthusiastic and focused on gaming) and pathology (someone with an illness/addiction)." *Id.*

[9] *See* Compl. ¶ 261; *see also Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.").

21

freely made and which now may not be pinned on McDonalds").

### B. Plaintiff Fails to State a Claim for Strict Product Liability.

Strict liability applies only to inherently and unreasonably dangerous "products." The Complaint fails to allege video games are "products" or inherently or unreasonably dangerous.

#### 1. Product Liability Does Not Apply to Intangible Expressive Media.

A "product" is "tangible personal property distributed commercially for use or consumption." Restatement (Third) of Torts: Prod. Liab. § 19 (1998) [10]; *cf. Kenebrew v. Connecticut Gen. Life Ins. Co.,* 882 F. Supp. 749, 754 (N.D. Ill. 1995) (plain meaning of "products" in statute excludes "intangibles"). "[T]angible" means "[c]apable of being touched . . ., perceptible to the touch; tactile; palpable," as distinct from "intangible" objects "that cannot be touched or perceived by touch." *Exelon Corp. v. Dep't of Revenue*, 917 N.E.2d 899, 910 (Ill. 2009). Recognizing this distinction, Illinois courts consistently hold that the term "products" includes only to "tangible" objects, not "intangible" services. *See, e.g.*, *English Co. v. Northwest Envirocon, Inc.*, 663 N.E.2d 448, 454 (Ill. App. Ct. 1996) ("product" in the Illinois sales commission statute refers "only to . . . tangible goods"); *Tenan v. StrategIQ Commerce, LLC*, 364 F. Supp. 3d 910, 920 (N.D. Ill. 2019) (same). The Court should follow suit here because product liability law "focuses on tangible property and excludes intangibles." Raymond T. Nimmer, Law of Comput. Tech. § 12:41 ("[M]ost software does not fall within the purview of product liability law[.]"); *cf. Sheridan v. iHeartMedia, Inc.*, 255 F. Supp. 3d 767, 781 (N.D. Ill. 2017) (dismissing conversion claim because "digital file[s]" are not "tangible"); *Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 809 (N.D. Ill. 2011) (same, for television programming).

---

[10] The Illinois Supreme Court has relied on the Restatement (Third) of Torts in analyzing product liability-related issues. *See, e.g.*, *Blue v. Env't Eng'g, Inc.*, 215 Ill. 2d 78, 89-97 (2005) (citing Restatement to analyze application of risk-utility test in strict products liability and negligence claims); *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 263 (2007) (citing *Blue* and the Restatement in analyzing strict liability claims).

Further, only objects of a "fixed nature" are within the scope of product liability law. *Anderson v. Farmers Hybrid Companies, Inc.,* 408 N.E.2d 1194, 1199 (Ill. App. Ct. 1980) (an object "must . . . be of a fixed nature at the time it leaves the seller's control"). As myriad gaming-related case law recognizes, video games are not of a "fixed nature"—they are "interactive" experiences that change based on the individual user's preferences and in-game choices. *See, e.g.*, *Brown*, 564 U.S. at 798; *Am. Amusement Machine Ass'n*, 244 F.3d at 577. The Complaint confirms as much, describing, for example, the "random reward[s]," "elements of variety," and "updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends" in *Fortnite*, Compl. ¶¶ 300, 303-304, the ability for players in *Call of Duty* to "customize their Operator" which "keep[s] players . . . engaged", *id.* ¶ 373, and a "near limitless" "array[] of activities and challenges to continually engage users" in *Grand Theft Auto V*, *id.* 392-94.

Given these "tangibility" and "fixed nature" principles, it is unsurprising that no court applying Illinois law has held that video games are "products." And courts nationwide have held the opposite. *See, e.g.*, *Sanders*, 188 F. Supp. 2d at 1278 ("intangible thoughts, ideas, and expressive content" in video games "not 'products'"); *Midway Games*, 198 F. Supp. 2d at 171-73, 181-82 (*Mortal Kombat* game not a "product"); *Quinteros v. InnoGames*, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (*Forge of Empires* video game "is not a product"), *aff'd on other grounds*, 2024 WL 132241 (9th Cir. Jan. 8, 2024); *Estate of B.H.*, 2022 WL 551701 at *3 ("There is no strict liability for books, movies, or other forms of media.").

These courts have emphasized the importance of tangibility. For example, the Sixth Circuit held that "video game[s] . . . are not sufficiently 'tangible' to constitute products in the sense of their communicative content[.]" *James*, 300 F.3d at 701. "When dealing with ideas and images, courts have been willing to separate the sense in which the tangible containers of those ideas are

23

products from their communicative element for purposes of strict liability." *Id.*; *see also Sanders*, 188 F. Supp. 2d at 1278 ("Plaintiffs fail to appreciate the critical distinction between intangible properties and tangible properties."). Thus, a game disc that causes physical harm—for example, by catching fire—might be subject to product liability law while the game content is not. *See Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-35 (9th Cir. 1991) (product liability "do[es] not take into consideration the unique characteristics of ideas and expression"); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 325 (S.D.N.Y. 2006) (dismissing product liability claims "because the intangible expressions . . . are not products"), *aff'd*, 279 F. App'x 40 (2d Cir. 2008).

This conclusion remains even when plaintiffs allege that a video game developer "specifically targeted a young audience, intending to addict them to the game." *Midway Games*, 198 F. Supp. 2d at 170-73, 181-82. As noted, the *Midway Games* court—consistent with every other court to assess the question—concluded that "*Mortal Kombat* is not a 'product' within the purview of the [Connecticut Product Liability Act]." *Id.* at 169. A different result would "raise serious First Amendment concerns." *Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. 2020); *Meow Media,* 300 F.3d at 695 (extending "tort liability . . . would raise significant constitutional problems under the First Amendment"); *Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1217-18 (D. Md. 1988) (tangibility requirement avoids "chill[ing] expression and publication").

This law forecloses Plaintiff's product liability theories, which are not premised on any physical attributes of the games, but rather on the experience of playing or otherwise interacting with video game content and design. *See* Compl. ¶ 507(a)-(d); *see also supra* § I.A. None of the features Plaintiffs claim to be addictive are "[c]apable of being touched," *Exelon Corp.*, 917 N.E.2d at 906, nor are they "fixed" in nature, *Anderson*, 408 N.E.2d at 1199, so they are also not products. *See* Restatement (Third) of Torts: Prod. Liab. § 19 (1998).

24

The distinction between "tangible," "fixed" goods subject to product liability law and video games is further borne out in the longstanding distinction between "services" and "products." "Courts are unanimous in refusing to categorize commercially-provided services as products." Restatement (Third) of Torts: Prod. Liab. § 19 cmt. F (1998); *see also Milford v. Com. Carriers, Inc.*, 210 F. Supp. 2d 987, 990 (N.D. Ill. 2002) ("[S]trict product liability does not extend to services."); *Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1011 (C.D. Cal. 2022) (Airbnb "is more akin to a service than to a product" because it "connects users"). Developer Defendants' video games fit neatly within this category. The games connect players in online competitive, cooperative, and creative experiences. *E.g.*, Compl. ¶¶ 278-280, 353, 394-96. And Developer Defendants "continuously add[] new game content," *id.* ¶ 174, such as "fresh features, new maps, live events, and the latest trends," *id.* ¶ 304. The ongoing, interactive, connective, and evolving aspects of these games are hallmarks of a service, not a "tangible" "product" under Illinois law.

This result avoids an irreconcilable conflict with the First Amendment. "Imposing liability for physical injuries caused by . . . ideas . . . would 'inhibit those who wish to share thoughts and theories,' for no author would write on a topic that could potentially result in physical injury to the reader." *Gorran*, 464 F. Supp. 2d at 324-25 (internal quotation marks omitted) (citing cases); *see also Jones*, 694 F. Supp. at 1217-18 (applying product liability to "dissemination of an idea or knowledge . . . could chill expression and publication which is inconsistent with fundamental free speech principles"). The Complaint impermissibly seeks to use product liability to inhibit Developer Defendants' "intangible expressions," *id.*, "communicative content," *James*, 300 F.3d at 701, and "thoughts, ideas and messages," *Sanders*, 188 F. Supp. 2d at 1278.

### 2. Plaintiff Has Not Plausibly Alleged That Video Games Are Unreasonably Dangerous.

The product liability claims independently fail because the Complaint fails to allege that

25

video games are unreasonably dangerous. This is an "essential element," *Andrade v. Gen. Motors Corp.*, 785 N.E.2d 214, 218 (Ill. App. Ct. 2003), and it is met only if the product "failed to perform in the manner that was reasonably expected in light of [its] nature and intended function," *Cozzi v. N. Palos Elementary Sch. Dist. No. 117*, 597 N.E.2d 683, 687 (Ill. App. Ct. 1992) (jungle gym not "unreasonably dangerous" despite plaintiff's fall because "[j]ungle gyms are recreational equipment to be used as such"). This requires "specific, factual allegations that are sufficient to show that the game was, as designed, unreasonably addictive." *Quinteros v. InnoGames*, 2024 WL 132241, at *3 (9th Cir. Jan. 8, 2024) (affirming decision that plaintiff failed to plead video game was unreasonably addictive by alleging game was "designed to promote excessive game-play by penalizing infrequent play" and defendants "exploited players with 'micro-transactions.'").

The Complaint does not meet this standard, offering only conclusory statements about the purportedly "addictive" nature of certain features. Compl. ¶¶ 107-167. Plaintiff does not even allege that all the games *have* these features. *E.g.*, Compl. ¶¶ 381-407 (no allegation *Grand Theft Auto V* has loot boxes). And the only common "monetization scheme" is simply that some content is available for sale. *E.g.*, Compl. ¶¶ 289, 370, 399. If anything, the Complaint's allegations undermine Plaintiff's claims. The Complaint alleges that hundreds of millions of people play *Fortnite* each month. *Id.* ¶¶ 290, 294; *see also id.* ¶ 345 (alleging *Call of Duty* "is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time"); *id.* ¶ 386 (alleging that *Grand Theft Auto* "has been played by over 30 million individuals"). Plaintiff does not, and cannot, allege that these individuals are addicted. The Complaint thus fails to sufficiently plead the "unreasonably dangerous" requirement.

### C.     Plaintiff Fails to Allege a Legal Duty Actionable in Negligence.

Plaintiff's negligence-based claims cannot stand because the Complaint fails to allege a

cognizable duty. A negligence "plaintiff must prove the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Vesely v. Armslist LLC*, 762 F.3d 661, 665 (7th Cir. 2014) (internal quotation marks omitted). The existence of a duty presents a question of law. *Page v. Blank*, 634 N.E.2d 1194, 1196 (Ill. App. Ct. 1994); *see also Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 433 (7th Cir. 1978). Federal courts applying Illinois law routinely dismiss actions that fail to allege a cognizable duty. *See, e.g.*, *Neumann v. Borg-Warner Morse Tec LLC*, 168 F. Supp. 3d 1116, 1125 (N.D. Ill. 2016) (manufacturers "did not owe a duty" to plaintiff exposed to asbestos); *Hasbun v. United States*, 941 F. Supp. 2d 1011, 1017 (N.D. Ill. 2013) (plaintiff "insufficiently alleged" duty").

Plaintiff claims each Defendant had a duty to (1) "use ordinary care" in designing their games, Compl. ¶ 580; (2) "give reasonable and adequate warning of dangers" of those services, *id.* ¶¶ 599, 615; and (3) "act as a reasonably careful company would under the circumstances," *id.* ¶ 681. These conclusory allegations misstate the law and ignore the First Amendment.

Courts routinely dismiss claims that assert game designers and other content creators owe their audience tort duties. For example, they have declined to impose duties on television broadcasters for claims that broadcast content "impermissibly stimulated, incited and instigated" a child to replicate the atrocities he viewed on television, *Zamora*, 480 F. Supp. at 200; on board game makers for a game that allegedly causes children "psychological harm," *Watters v. TSR, Inc.*, 904 F.2d 378, 379 (6th Cir. 1990); on magazines for publishing a description of a practice that allegedly prompted a reader to asphyxiate himself, *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802, 803-04 (S.D. Tex. 1983); and on video game publishers to prevent injuries allegedly caused by interacting with game content, *Sanders*, 188 F. Supp. 2d at 1272. As one court explained, "it is simply not acceptable to a free and democratic society to impose a duty . . . to limit and restrict []

27

creativity in order to avoid the dissemination of ideas in" "speech which may adversely affect" some parts of its audience. *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1005-06 (1988).

Plaintiff's proposed duty—which would require publishers to censor content that might (in Plaintiff's view) cause harm—would stifle the creation and dissemination of protected expression across media, *see supra* § I, creating "serious[]" "constitutional concerns." *Watters,* 904 F.2d at 382-83 (citing cases). This proposal should be rejected.

Plaintiff cannot overcome this defect by pointing to the statutes underlying its negligence per se claim to define a duty owed. Because the Consumer Fraud Act and the Deceptive Practices Act require knowledge of the alleged deception, neither imposes strict liability. They thus "cannot provide the basis for a negligence per se claim." *Roberson ex rel. Roberson v. Novartis Pharms. Corp.*, 2011 WL 1740137, at *2 (N.D. Ill. May 5, 2011); *see Gillespie Cmty. Unit Sch. Dist. No. 7, Macoupin Cnty. v. Union Pac. R. Co.*, 43 N.E.3d 1155, 1194–95 (Ill. Ct. App. 2015) (defining "strict liability" as "liability that does not depend on . . . intent to harm" (alterations adopted, internal quotation marks omitted)).[11] COPPA cannot serve as the basis for Plaintiff's negligence per se claim for the reasons set forth below. Plaintiff's negligence claims must be dismissed.

### D. Plaintiff's COPPA Claim Is Preempted.

Plaintiff has failed to state a claim under COPPA, 15 U.S.C. § 6501 *et seq*. *See* Compl. ¶¶ 624-707 (Count VII). She asserts that COPPA violations underlay her claims for negligence per se and for violations of the Consumer Fraud Act and the Deceptive Practices Act. *See, e.g., id.*

---

[11] Plaintiff also alleges that the Rockstar Defendants' "collection and maintenance of photographs, audio recordings, and video footage" and Roblox's "'voice chat' feature" violate the Illinois Biometric Information Privacy Act ("IBIPA") 740 ILCS § 14/1 *et seq*. Compl. ¶¶ 673-74. But the IBIPA is also not a strict liability statute, *see Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679, 683 (N.D. Ill. 2023) (a IBIPA claim "requires something beyond possession" of the biometric information, and instead requires an "active step" to "collect or obtain biometric identifiers or information"), and cannot form the basis of a negligence per se claim. *See Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 394–95 (1999).

¶ 659, ¶¶ 656-671. But Plaintiff's COPPA-related claims fail as a matter of law because there is no private right of action under COPPA. To the contrary, COPPA contains an express preemption provision that prohibits Plaintiff from bringing tort claims based on COPPA:

> No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under this section.

15 U.S.C. § 6502(d). Enforcement of COPPA is limited to state attorneys general and the Federal Trade Commission. *Id*. §§ 6504, 6505. There is no private right of action. *Id*.

Courts construe COPPA's preemption language strictly, rejecting state law claims that seek to enforce COPPA. *See Manigault-Johnson v. Google, LLC*, 2019 WL 3006646, at *6 (D.S.C. 2019) (Congress "clearly intended to preclude" use of "state law to privately enforce" COPPA); *T.K. ex rel. Leshore v. Bytedance Tech. Co.*, 2022 WL 888943, at *25 (N.D. Ill. Mar. 25, 2022) (COPPA "does not provide for a private right of action."). Private claims are permissible only if they are "*brought as fully stand-alone causes of action* under state law … [that] involve conduct that *also* violates COPPA." *Jones v. Google LLC*, 73 F.4th 636, 643-44 (9th Cir. 2023) (finding narrow exception for claims "*parallel* to, or *proscribe the same conduct forbidden* by, COPPA" (emphasis added)). Far from asserting a "stand-alone" claim that incidentally forbids the same conduct as COPPA, Plaintiff asserts a negligence per se claim based on alleged COPPA violations. *See In re Blackbaud, Inc., Customer Data Breach Litigation*, 567 F. Supp. 3d 667 (D.S.C. 2021) (negligence per se claim based on alleged COPPA violation is preempted). Plaintiff's COPPA theory also fails for the same reasons under Illinois law. "Because negligence *per se* imposes strict liability, it must be clear from the face of the statute that the legislature intended to impose such

29

liability for a violation." *Aharon v. Babu*, 2023 WL 2214429, at *5 (N.D. Ill. Feb. 24, 2023).

COPPA's preemption clause makes clear that Congress did not so intend.

Plaintiff's negligence per se claim fails for the additional independent reason that a violation of a statute cannot support a negligence per se claim under Illinois law unless the statute is "designed to protect human life." *Bier v. Leanna Lakeside Prop. Ass'n*, 711 N.E.2d 773, 783 (Ill. App. Ct. 1999). COPPA's express purpose is not to protect human life but to protect minors from potential privacy-related harms on the Internet. *See FTC Guidance on COPPA*, www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.

Plaintiff's attempt to manufacture an alleged COPPA violation as a predicate act for a Consumer Fraud Act or Deceptive Practices Act claim also fails because Plaintiff "cannot rely on the same conduct" alleged for the COPPA violation "to establish separate unfair and deceptive theories" under state fraud statutes. *See In re VTech Data Breach Litig.*, 2018 WL 1863953, at *7 (N.D. Ill. Apr. 18, 2018) (rejecting attempt to predicate an Illinois consumer fraud claim on an alleged COPPA violation); *see also H.K. through Farwell v. Google LLC*, 595 F. Supp. 3d 702, 709 (C.D. Ill. 2022) (claim by schoolchildren under BIPA biometric law preempted by COPPA). Here, Plaintiff's Consumer Fraud Act and Deceptive Practices Act claims are barred because they are based on the same alleged conduct as Plaintiff's COPPA claim. *See* ¶¶ 637-639, 658-670.

Finally, as "Plaintiff[] ha[s] not alleged any unfair conduct separate from the deceptive conduct," her allegations are subject to "Rule 9(b)'s heightened pleading requirement." *In re VTech Data Breach Litig.*, 2018 WL 1863953, at *7. Plaintiff fails to allege that D.G. indicated that they were under 13 years old when they accessed Defendants' games—as is required to state a claim. *See* COPPA FAQs A.12 and D.4 (operators can rely on the age information provided by a user in the age screen). Plaintiff's conclusory allegations fail to state a claim. *See infra* § II.E.

30

**E. Plaintiff Has Not Adequately Pleaded Any of Their Fraud-Based Claims.**

Each of Plaintiff's fraud-based claims (Counts XIII-XVII) is subject to and fails to satisfy Rule 9(b)'s pleading requirements. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (fraud); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) (Consumer Fraud Act); *AAVN, Inc. v. WestPoint Home, Inc.*, 2019 WL 1168102, at *2 (N.D. Ill. Mar. 13, 2019) (Deceptive Practices Act).

**1. Plaintiff's Misrepresentation Claims Do Not Satisfy Rule 9(b).**

A claim for fraudulent misrepresentation must allege "(1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Simmons v. Campion*, 991 N.E.2d 924, 932 (Ill. 2013) (internal quotation marks and citations omitted). A claim for negligent misrepresentation differs in that it requires "carelessness or negligence in ascertaining the truth of the statement" and that the defendant have "a duty to communicate accurate information." *Fox Assocs, Inc. v. Robert Half Int'l, Inc.*, 777 N.E.2d 603, 606 (Ill. App. Ct. 2002). For both claims, Plaintiff must "state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom*, 20 F.3d at 777 (internal quotation marks and citations omitted). Further, if a statement is "puffery" or "a statement of subjective description or opinion," it "is not actionable as a fraudulent misrepresentation." *Castaneda v. Amazon.com, Inc.*, 2023 WL 4181275, at *6 (N.D. Ill. June 26, 2023) (internal quotation marks and citations omitted); *supra* at I.B.

Plaintiff falls well short of this standard. Plaintiff vaguely alleges that Developer Defendants misrepresented that their games are "safe" but fails to identify the statements, where

31

they were made, when they were made, and by whom—whether in connection with their claim for fraudulent misrepresentation or under the Consumer Fraud Act and Deceptive Practices Act. *See, e.g.*, Compl. ¶ 822(a)-(d) (rote allegations regarding safety); *see also* ¶¶ 824(a),(c),(d), 789, 806, 824, 854. For the single statement Plaintiff has identified as to Developer Defendants—that Epic claimed that *Fortnite* is "educational," Compl. ¶¶ 310, 824(a)—Plaintiff does not explain why it is false, nor could she, as it is a protected statement of opinion. *See supra* § I.B. Nor does Plaintiff allege Epic had knowledge of its falsity. *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 957 (N.D. Ill. 2011) (fraud claims insufficiently pleaded where allegations are not made "with specificity and particularity"); *Anast v. Commonwealth Apartments*, 956 F. Supp. 792, 802 (N.D. Ill. 1997) (Consumer Fraud Act claims "must be pleaded with the same specificity that has always been a prerequisite to an action for common law fraud").

Finally, Plaintiff fails to allege she or D.G. read or heard any purported misrepresentations, much less relied on them, providing an independent basis for dismissal. *See* Compl. ¶¶ 792, 859, 869-70; *cf.* ¶ 693-94; *Doe v. Dilling*, 861 N.E.2d 1052, 1075 (Ill. App. Ct. 2006), *aff'd*, 888 N.E.2d 24 (Ill. 2008) ("the theory of fraudulent misrepresentation, must fail because of [plaintiff's] failure to establish that her reliance on [defendants'] representations was reasonable"); *Gandhi v. Sitara Cap. Mgmt., LLC*, 689 F. Supp. 2d 1004, 1017 (N.D. Ill. 2010) (similar).

### 2. Plaintiff's Fraudulent Concealment Claim Does Not Allege Any Affirmative Actions by Developer Defendants.

To state a claim for fraudulent concealment requires more than a purported omission or affirmative misrepresentation. Plaintiff must, "in addition to meeting the elements of fraudulent misrepresentation," allege that "the defendant *intentionally* omitted or concealed a material fact that it was under a duty to disclose to the plaintiff." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) (emphasis added). "[S]ilence, standing alone, is not actionable

concealment." *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 709 (N.D. Ill. 2020), *aff'd*, 37 F.4th 1326 (7th Cir. 2022). Rather, that silence must be "combined with deceptive conduct or the suppression of material facts." *Id.* (internal quotation marks and citation omitted).

Plaintiff fails to allege any step that any Developer Defendant took to conceal information. *See* Compl. ¶¶ 839(a)-(d), 840, 849; *see Miner v. Fashion Enterprises, Inc.*, 794 N.E.2d 902, 917 (Ill. App. Ct. 2003) (dismissing claim absent "assertion that the concealment was done with an intent to deceive"); *see also, e.g.*, *You v. Japan*, 2015 WL 6689398, at *4 (N.D. Cal. Nov. 3, 2015) (allegations that defendant "purposefully and intentionally concealed or manipulated the evidence" insufficient). And the facts that Plaintiff does allege contradict such a conclusion: Every allegation about the purportedly addictive nature of video games is based on publicly available information. *See* Compl. ¶¶ 222-263 (discussing literature). Where, as here, Plaintiff has "equal knowledge," the information cannot have been fraudulently concealed. *Cent. States Joint Bd. v. Cont'l Assur. Co.*, 453 N.E.2d 932, 936 (Ill. App. Ct. 1983) ("A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another.").

**3. Plaintiff's Fraudulent Inducement Claim Does Not Plead Inducement.**

Plaintiff's fraudulent inducement claim fails for the additional reason that Plaintiff does not identify what she or D.G. purportedly was induced into doing. Plaintiff contends generally that D.G. made purchases at unidentified times from unidentified Developer Defendants. *See, e.g.*, Compl. ¶¶ 843, 867. But that does not state a claim for fraud. *See Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (Seventh Circuit rejects fraud claims that "have lumped together multiple defendants, and we do so again here") (internal quotation marks omitted).

**F. Plaintiff Fails to Plausibly Allege Intentional Infliction of Emotional Distress.**

A plaintiff alleging intentional infliction of emotional distress must allege facts

33

demonstrating that "(1) the defendant engaged in 'extreme and outrageous' conduct toward the plaintiff, (2) the defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress, (3) the plaintiff endured 'severe or extreme' emotional distress, and (4) the defendant's conduct actually and proximately caused the plaintiff's distress." *Ulm v. Mem'l Med. Ctr.*, 964 N.E.2d 632, 641 (Ill. App. Ct. 2012). "Illinois sets a 'high bar' for" such claims, requiring that the conduct "'be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 859 (7th Cir. 2023) (citations omitted); *see Reilly ex rel. Reilly v. Wyeth*, 876 N.E.2d 740, 755 (Ill. App. Ct. 2007) ("[t]he complaint must be specific, and detailed beyond what is normally considered permissible in pleading a tort action.") (internal quotation marks omitted).

Creating and hosting video games does not clear the high bar for outrageous conduct. Conduct is extreme and outrageous only if it is "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Taliani v. Resurreccion*, 115 N.E.3d 1245, 1254 (Ill. App. Ct. 2018). Courts have dismissed claims across a wide swath of cases, including direct threats, verbal assaults, and abuses of power, when the alleged conduct did not meet the extreme and outrageous standard. *See*, *e.g.*, *Bannon v. Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007) (boss's use of racial slurs not outrageous); *Herrera v. Di Meo Bros., Inc.*, 529 F. Supp. 3d 819, 831 (N.D. Ill. 2021) (threatening to fire employee for complaining about threats to personal safety not outrageous); *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 981 N.E.2d 1069, 1080 (Ill. App. Ct. 2012) (causing plaintiff's condominium to be uninhabitable, which adversely affected plaintiff's dementia, not outrageous). Far from being "intolerable in a civilized society," as these cases require, the development of creative, engaging, and entertaining video games is celebrated, as reflected by the fact that video game play is common. *See* Compl. ¶ 220 ("67% of

34

all Americans play video games"). Defendants' development of *Fortnite*, *Grand Theft Auto V*, and *Call of Duty* therefore does not meet the exacting requirements of a properly stated intentional infliction of emotional distress claim. *See Quinteros v. InnoGames*, 2020 WL 3574268, at *3 (W.D. Wash. July 1, 2020) (dismissing analogous claim involving use of a video game).

The claim is independently deficient because Plaintiff nowhere identifies any factual allegations that any Defendant knowingly or intentionally took any action to cause her or D.G. distress. *See Lewis v. Cotton*, 932 F. Supp. 1116, 1119 (N.D. Ill. 1996) ("A defendant must *intend* to cause, or *recklessly disregard* the probability of causing, emotional distress." (emphasis in original)). Plaintiff's claims thus do not rise to the exacting level of conduct "intolerable in a civilized community" and should be dismissed. *Taliani*, 2018 IL App (3d) 160327, ¶ 26.

## G. Plaintiff Fails to State a Civil Conspiracy or In-Concert Liability Claim.

A civil conspiracy is "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citation omitted). In-concert liability similarly arises where a defendant "does a tortious act in concert with the other or pursuant to a common design with him," "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself," or "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018). Plaintiff cannot assert either kind of conspiracy claim without showing an underlying unlawful or tortious act. *See Indeck N. Am. Power Fund, L.P. v. Norweb, P.L.C.*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000)

35

(conspiracy); *Rogers v. Reagan*, 823 N.E.2d 1016, 1020 (Ill. App. Ct. 2005) (in-concert liability). Because none exists here, these claims fail.

In addition, both claims require that the conspirator understood the unlawful aims of the scheme and conspired to further them. *See Clay Fin. LLC v. Mandell*, 2017 WL 3581142, at *6 (N.D. Ill. Aug. 18, 2017) (defendant must "understand[] the general objectives of the conspiratorial scheme, accepts them, and agrees . . . to further those objectives"); *Rogers v. Reagan*, 823 N.E.2d 1016, 1020 (Ill. App. Ct. 2005) (for in-concert liability, "the defendant's conduct must be more than benign," and "[t]he defendant must actively participate in the tortious conduct of another." (internal quotation marks omitted)). Plaintiff alleges no facts to support a plausible inference that Developer Defendants conspired to achieve an unlawful purpose—rather than develop games that are indisputably legal, enjoyed by millions, and protected by the First Amendment. *See* Compl. ¶ 220; *Brown*, 564 U.S. at 790. Plaintiff thus has not stated a claim for conspiracy.

## CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim upon which relief can be granted, and any amendment would be futile. The Court should therefore dismiss the Complaint with prejudice. *See Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008) (courts have "broad discretion" to deny amendment where it "would be futile"); *ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d 789, 801 (N.D. Cal. 2010) (denying leave to amend where there was "no way" additional facts could fall "outside the protections of the First Amendment), *aff'd sub nom. ZL Techs., Inc. v. Gartner Grp., Inc.*, 433 F. App'x 547 (9th Cir. 2011).

36

Dated: April 19, 2024

Respectfully submitted,

**SWANSON MARTIN & BELL LLP**

Michael A. McCaskey
330 N. Wabash, Suite 3300
Chicago, IL 60611
(312) 321-8464
Email: mmccaskey@smbtrials.com

- AND -

**HUESTON HENNIGAN LLP**

Moez M. Kaba*
Allison L. Libeu*
Padraic Foran*
523 West 6th St., Suite 400
Los Angeles, California 90014
(213) 788-4340
Email: mkaba@hueston.com
     alibeu@hueston.com
     pforan@hueston.com

Adam Minchew*
1 Little West 12th St.
New York, New York 10014
(646) 930-4046
Email: aminchew@hueston.com

* Admitted *pro hac vice*

*Attorneys for Defendant Epic Games, Inc.*

**KING & SPALDING LLP**

Geoffrey M. Drake*
TaCara Harris*
1180 Peachtree St., NE, Suite 1600
Atlanta, GA 30309
(404) 572-4600

David P. Mattern*
Paul Weeks*
1700 Pennsylvania Avenue, NW, Suite 900

37

Washington, DC 20006
(202) 737-0500

Julia Zousmer (IL Bar # 6325189)
110 N. Upper Wacker Dr., Suite 3800
Chicago, IL 60606
(312) 995-6333

\* Admitted *pro hac vice*

*Attorneys for Defendants Activision Blizzard, Inc., Infinity Ward, Inc., Treyarch Corp., and Sledgehammer Games, Inc.*

**NEAL, GERBER & EISENBERG LLP**
Lee J. Eulgen
leulgen@nge.com
Tonya G. Newman
tnewman@nge.com
2 N. LaSalle St. Suite 1700
Chicago, IL 60602
Phone: (312) 269-8000

- AND -

**MITCHELL SILBERBERG & KNUPP LLP**
Karin G. Pagnanelli (*Pro Hac Vice*)
kgp@msk.com
Marc E. Mayer (*Pro Hac Vice forthcoming*)
mem@msk.com
Gabriella N. Ismaj (*Pro Hac Vice*)
gan@msk.com
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Tel: (310) 310-2000
Fax: (310) 312-3100

*Attorneys for Defendants Take-Two Interactive Software, Inc., Rockstar Games UK Ltd. (erroneously named as Rockstar North Limited), and Rockstar Games, Inc.*

38