**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JACLYN ANGELILLI, individually and on
behalf of D.G., a Minor;

      Plaintiffs,

    v.

ACTIVISION BLIZZARD, INC.;
INFINITY WARD, INC.; TREYARCH
CORP.; SLEDGEHAMMER GAMES, INC.;
EPIC GAMES, INC.; ROBLOX
CORP.; ROCKSTAR NORTH
LTD.; ROCKSTAR GAMES, INC.;
TAKE-TWO INTERACTIVE SOFTWARE,
INC.; SONY INTERACTIVE
ENTERTAINMENT LLC; NINTENDO OF
AMERICA, INC.; GOOGLE LLC; and
APPLE, INC.;

      Defendants.

No. 23-cv-16566

Judge April M. Perry

**OPINION AND ORDER**

Plaintiff Jaclyn Angelilli brought this case individually and on behalf of her minor son,

D.G., against numerous developers of video games and gaming consoles (collectively,

"Defendants"). Plaintiffs allege that D.G. began playing video games when he was six years old

and today plays six to eight hours a day. By Plaintiffs' description, Defendants' games and

consoles caused D.G. to develop video game addiction, a condition allegedly characterized by

severe emotional distress, diminished social interactions, and withdrawal symptoms such as rage

and physical outbursts. Angelilli alleges she too has suffered harms due to her proximity to

D.G.'s addiction and its symptoms.

This opinion resolves the motions to compel arbitration filed by the following defendants:

(i) Defendants Activision Blizzard, Inc., Infinity Ward, Inc., Treyarch Corp., and Sledgehammer

Games, Inc. (collectively, "Activision" or "Activision Defendants"), Doc. 121; (ii) Defendants

Take-Two Interactive Software, Inc. ("Take-Two"), Rockstar Games UK Ltd.,[1] and Rockstar

Games, Inc. (collectively with Take-Two, "Rockstar" or the "Rockstar Defendants"), Doc. 125;

(iii) Defendant Nintendo of America, Inc. ("Nintendo"), Doc. 134; (iv) Defendant Epic Games,

Inc. ("Epic"), Doc. 139; and (v) Defendant Sony Interactive Entertainment LLC ("Sony"), Doc.

153.[2] With the exception of Sony, all of the moving defendants have also asked for the Court to

stay the litigation pending the outcome of arbitration, if the Court finds either D.G.'s or

Angelilli's claims must be arbitrated. Finally, Roblox Corporation, Google LLC, and Apple, Inc.

are also defendants in this action, though these defendants have not moved to compel arbitration.

**LEGAL STANDARD**

The Federal Arbitration Act authorizes federal district courts to compel a dispute between

parties to arbitration if it finds that (1) the parties formed a valid, written agreement to arbitrate;

(2) the dispute falls within the scope of that agreement, and (3) a party refuses to arbitrate.

*Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). The first element is

a question of contract formation, and is the primary issue the Court must resolve for the purposes

of Defendants' motions to compel arbitration.

Since "arbitration agreements are contracts, a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit." *A.D. v. Credit One Bank, N.A.*,

885 F.3d 1054, 1060 (7th Cir. 2018) (quoting *United Steelworkers of Am. v. Warrior & Gulf

Navigation Co.*, 363 U.S. 574, 582 (1960)) (internal quotation marks omitted). Courts apply

ordinary principles of state contract law to determine whether parties formed an agreement to

---

[1] According to the Rockstar Defendants, Plaintiffs named the wrong Rockstar entity in their complaint, and so the corrected name is used here. Doc. 125-1 ("Ungberg Decl.") ¶ 1.

[2] Microsoft Corporation, previously a defendant, filed its own motion to compel arbitration but has since been voluntarily dismissed from this action. Doc. 148; Doc. 195.

arbitrate. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). In some cases, parties may disagree on which state's law should apply to the formation question. To resolve the conflict, a federal court sitting in diversity applies "the choice-of-law rules of the forum state to determine which state's law applies." *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018). The forum here is Illinois, and Illinois choice of law principles dictate that the court should apply "forum law unless an actual conflict with another state's law is shown." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, [courts] will apply the law of the forum state."). "A choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck, and Co.*, 879 N.E.2d 893, 898 (Ill. 2007).

Although their claims are related, D.G. and Angelilli each allege their own injuries. Since Defendants seek to compel both sets of claims to arbitration, the Court must consider whether D.G. can be compelled to arbitrate based on an agreement only Angelilli accepted, and vice versa.[3] "[A]n arbitration agreement generally cannot bind a non-signatory," *i.e.*, a person who did not themselves accept the agreement to arbitrate. *A.D.*, 885 F.3d at 1059. Courts will not compel a non-signatory to arbitration unless "the party seeking to compel arbitration can show that an exception to this general rule applies." *Id.* at 1060. Whether an exception applies to this general rule is governed by "traditional principles of state law." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). "State law typically provides only for a handful of limited exceptions to the prohibition against binding nonsignatories: (1) assumption, (2) agency, (3)

---

[3] The Court will address below the argument by some Defendants that Angelilli's claims are entirely derivative of D.G.'s, to the extent this bears on the arbitration question.

estoppel, (4) veil piercing, and (5) incorporation by reference." *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1019 (7th Cir. 2024) (citing *A.D.*, 886 F.3d at 1059-60).

Once it is determined that parties formed an agreement to arbitrate, courts may presumptively resolve challenges aimed at the validity, enforceability, and scope of that agreement. *AT&T Techs., Inc. v. Commc'ns Workers of America*, 475 U.S. 643, 649 (1986); *see also First Options*, 514 U.S. at 944-45. That said, parties may agree to delegate these questions to be decided in arbitration rather than in court. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). For this to occur, there must be clear and unmistakable evidence that parties intended to delegate authority to the arbitrator to answer threshold, post-formation questions of validity, enforceability and scope. *First Options*, 514 U.S. at 944. Often, that evidence takes the form of a written provision in a contract expressing the parties' intent to have the arbitrator decide such issues as enforceability and scope of an arbitration agreement. *See, e.g.*, *Rent-A-Center*, 561 U.S. at 71-72 (discussing a written delegation provision); *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022) (intent to delegate found in "broad delegation clause"). Where the parties have delegated these issues to arbitration, the court "possesses no power to decide the arbitrability issue," whatever its view of the merits. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

Some issues are always within the Court's power to decide, regardless of attempts to delegate them. For example, the court determines whether the parties formed a contract. *K.F.C.*, 29 F.4th at 837 ("Even the most sweeping delegation cannot send the contract-formation issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate."). This includes the issue of whether an arbitration agreement was formed between a signatory and a non-signatory. *See, e.g.*, *CCC Info. Servs. Inc. v. Tractable Inc.*, 2019 WL

4

2011092 at *2 (N.D. Ill. May 7, 2019) (issue of whether agreement existed between signatory and non-signatory was "for the court to decide"), *aff'd*, 36 F.4th 721 (7th Cir. 2022); *Coatney v. Ancestry.com DNA, LLC*, 2022 WL 4602653, at *6 (S.D. Ill. Sept. 30, 2022) (despite clear and unmistakable delegation between the signatories, court decided issue of whether non-signatories were bound), *aff'd*, 93 F.4th 1014 (7th Cir. 2024). The Court may also consider a party's arguments that the delegation clause itself is invalid or unenforceable, provided the party "challenge[s] the delegation provision specifically." *Rent-A-Center*, 561 U.S. at 72. If an argument about the validity or enforceability of the delegation clause applies to the contract generally—or even to just the arbitration provisions of a larger contract—the Court may not consider it to the extent there is clear and unmistakable delegation. *Id.*

The party seeking to compel arbitration bears the burden of demonstrating the existence of an agreement to arbitrate. *A.D.*, 885 F.3d at 1060. If the moving party carries its burden, the party opposing arbitration must supply countervailing facts that meet the evidentiary standard required of a party opposing summary judgment. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002). That is, the nonmoving party must submit evidence sufficient to raise a genuine issue of material fact concerning the existence of the agreement. *Id.* On the Court's review of the evidence, any "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in [her] favor." *Id.* The Court may not make credibility determinations, choose between competing inferences, or balance the relative weight of conflicting evidence. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

If the Court finds there are arbitrable issues, the FAA requires that the Court compel arbitration and to stay the litigation of those issues. *Volkswagen of America, Inc. v. Sud's of*

*Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). But for non-arbitrable issues, the district court

has discretion to stay or allow the litigation to proceed even while the parties resolve their other

issues in arbitration, provided that the district court properly considers "the risk of inconsistent

rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice

that may result from delays" resulting from a stay. *Id.* at 972.

## ANALYSIS

There are two plaintiffs in this case. Although Jaclyn Angelilli litigates on behalf of her

son D.G., she also brings her own independent claims. Thus, for each Defendant, the Court must

determine whether an agreement to arbitrate was formed with D.G. and whether an agreement to

arbitrate was formed with Angelilli.

### I.     Activision Defendants

The Court starts with the Activision Defendants, who are developers of the *Call of Duty*

franchise of games. Doc. 122-1 ("Bent Decl.") ¶ 2. To play *Call of Duty*, players like D.G. must

affirmatively agree to Activision's Terms of Use and End User License Agreement (collectively,

the "Activision Agreements"). *Id.* ¶ 3. This can occur in two ways. First, players must accept the

Activision Agreements in order to create an Activision/*Call of Duty* account. Account creation

can occur either in-game or on Activision's website. *Id.* ¶¶ 6-7. If an account is created in-game,

the user must scroll through and accept the Activision Agreements by clicking an "Accept"

button. *Id.* ¶ 6. If account creation occurs on Activision's website, the user must check a box

stating, "By checking the box, I accept Activision's TERMS of USE and acknowledge having

read its PRIVACY POLICY." *Id.* ¶ 7. Additionally, the first time a player opens a *Call of Duty*

game, they are presented with the Activision Agreements on-screen, which they may not proceed

past until they scroll through and click an "Accept" button. *Id.* ¶¶ 8-9.

The Activision Agreements contain virtually identical arbitration provisions stating in relevant part:

> To the fullest extent allowed by applicable law, you and Activision agree to submit all Disputes between us to individual, binding arbitration ... A "Dispute" means any dispute, claim, or controversy … between you and Activision that in any way relates to or arises from any aspect of our relationship …
> ***
> The arbitrator shall determine the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration. The arbitrator has authority to decide all issues of validity, enforceability or arbitrability, including, but not limited to, where a party raises as a defense to arbitration that the claims in question are exempted from the arbitration requirement or that any portion of this agreement is not enforceable.
> ***
> … [A]ny claims or requests for relief arising out of this Agreement … will be subject to the laws of the State of Delaware, without reference to conflict of law principles."

Bent Decl. Ex. C at 4-6; Bent Decl. Ex. D at 11-13.

The Activision Agreements also contain provisions directed at minors regarding their parents. These provisions require the reader to affirm their status as legal adults and instruct that "If you are under the legal age of majority, your parent or legal guardian must consent to this agreement." Bent Decl. Ex. C at 1; Bent Decl. Ex. D at 1. The Terms of Use, but not the EULA, also include a section pronouncing that parents "are jointly and severally liable for all acts … and omissions of their children aged under 18" when playing *Call of Duty* games. Bent Decl. Ex. C at 2.

Activision asserts that D.G. affirmatively agreed to both Activision Agreements by playing *Call of Duty* and by creating an Activision account using an email associated with Plaintiffs. *See* Doc. 122 at 9; Doc. 122-2 ("Byer Decl.") ¶ 3. Plaintiffs do not dispute the fact that D.G. played *Call of Duty*. *See* Doc 166 at 2-3; Doc. 164-1 ("Angelilli Aff.") ¶¶ 4, 6. Nor do they dispute that an Activision account was created using an email associated with Plaintiffs. Doc. 166 at 2. However, they assert Angelilli never saw the Activision Agreements or discussed it

with D.G. and so cannot have consented to the agreement. Doc. 166 at 10, citing Angelilli Aff. ¶¶ 59-60.

### a. Whether D.G. is bound to arbitrate

The Court starts with whether D.G. agreed to arbitrate. As an initial matter, Plaintiffs and Activision dispute whether Illinois or Delaware law applies to the question of contract formation. Doc. 122 at 8; Doc. 166 at 6-7. However, neither party has identified an actual conflict between contract formation principles in the two states. The Court will therefore apply Illinois law. *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir. 1993).

Under Illinois law, contract formation "requires only a manifestation of mutual assent on the part of two or more persons." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 711 (7th Cir. 2019) (citing *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. Ct. App. 2004)). Formation is evaluated under an "objective theory" where "intent to manifest assent … is revealed by outward expressions such as words and acts." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016).

Plaintiffs admit that D.G. played *Call of Duty* and do not challenge Activision's evidence that individuals cannot use Activision's products until they affirmatively agree to the Activision Agreements. But Plaintiffs contend no contract formed between D.G. and Activision because the Activision Agreements contain a provision reading, "If you are under the legal age of majority, your parent or legal guardian must consent to this agreement." Bent Decl. Ex. C at 1; Bent Decl. Ex. D at 1. According to Plaintiffs, this makes the securing of parental consent a condition precedent to formation of a contract, and an unfulfilled one at that, since Angelilli did not consent. Activision responds that the provision does not create a condition precedent, and that

8

even if it does, the securing of Angelilli's consent was an event in D.G.'s control, and so Plaintiffs may not invoke the condition's failure to avoid the consequences of the Activision Agreements.[4]

As the proponent, Plaintiffs bear the burden of proving a condition precedent. *Wasserman v. Autohaus on Edens, Inc.*, 559 N.E.2d 911, 916 (Ill. App. Ct. 1990). Under Illinois law, "[a] condition precedent is defined as a condition in which performance by one party is required before the other party is obligated to perform." *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 23 (Ill. App. Ct. 2007). "If an offer contains a condition precedent, a contract does not form unless and until the condition is satisfied." *Taylor v. JPMorgan Chase Bank, N.A.*, 958 F.3d 556, 563 (7th Cir. 2020). "Whether an act is necessary to formation of the contract or [alternatively] the performance of an obligation under the contract depends on the facts of the case." *McAnelly v. Graves*, 467 N.E.2d 377, 379 (Ill. App. Ct. 1984). Generally, Illinois courts will not interpret language in a contract as creating a condition precedent "unless the intent to create such a condition is apparent from the face of the agreement." *Catholic Charities of Archdiocese of Chicago v. Thorpe*, 741 N.E.2d 651, 654 (Ill. App. Ct. 2000). In other words, "a condition precedent must be stated expressly and unambiguously." *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 798 (7th Cir. 1999). "Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise." *Id*.

Even when found, unsatisfied conditions precedent do not always defeat contract formation. "If one party directly *causes* the condition to fail … the contract may be fully

---

[4] The Court rejects Activision's argument that "an arbitrator, not the Court, must decide Plaintiffs' challenge, which goes to the validity of the entire agreement and not the arbitration clause specifically." Doc. 175 at 3. Many of Plaintiffs' arguments go to validity or enforceability, which the Court will send to the arbitrator to consider if the Activision Agreements contain a clear and unmistakable delegation clause. But Plaintiffs also raise arguments that challenge formation, which are the Court's to resolve. *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022).

enforced against that party." *Cummings v. Beaton & Assoc., Inc.*, 618 N.E.2d 292, 303 (Ill. App. Ct. 1992) (emphasis in original).

The Court rejects, on two grounds, Plaintiffs' argument that contract formation failed due to an unsatisfied condition precedent. First, rather than being "express and unambiguous" that the parties intended to create a condition precedent, the parental consent language reads more like a promise that the parent had given (or would give) consent. The phrase "your parent or legal guardian must consent to this agreement" is unlinked to either party's duty to perform and leaves open how and when the consent should occur. That alone makes this case distinguishable from cases finding a condition precedent under Illinois law. *See, e.g., Albrecht v. North Am. Life. Assur. Co.*, 327 N.E.2d 317, 318-19 (Ill. App. Ct. 1975) (provision stating employee "shall become insured" only after submission of his insurance application created a condition precedent). Second, even if the securing of parental consent was a condition precedent to contract formation, it was an event within D.G.'s control. Since contracts may be enforced against parties who cause conditions to fail, Plaintiffs may not assert the argument that no contract formed between D.G. and Activision based on the unfulfilled condition.

The Court also disagrees with Plaintiffs' argument that the parental consent provision limits the offer made by the Activision Agreements to parents, not their minor children. For guidance, the Court turns to *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014 (7th Cir. 2024). In *Coatney*, Ancestry.com ("Ancestry") did not want minors to use their DNA test kits without the consent of a parent or guardian. To effectuate this goal, Ancestry required parents of minors who wanted their child's DNA analyzed to accept certain terms. *Id.* at 1018. One such term required parents to represent their consent to have Ancestry "use your child's DNA to provide reports about your child's ancestral origins" and "[i]dentify your child's potential relatives." *Id.*

Here, unlike in *Coatney*, there is no language in the Agreements to suggest the contracts were directed toward the parents. To the contrary, the language in the Agreements is directed toward the child. *See* Bent Decl. Ex. C at 1; Bent Decl. Ex. D at 1 ("If you are under the legal age of majority, your parent or legal guardian must consent to this agreement). As such, the Court disagrees with Plaintiffs that no contract was formed with D.G. because the offer was made only to Angelilli.

Plaintiffs also assert that no contract was formed with Activision because D.G. was a minor and therefore lacked capacity to legally accept. The problem with this argument is that youth does not prevent contract formation under Illinois law. *See K.F.C. v. Snap Inc.*, 29 F.4th 835, 838 (7th Cir. 2022) (youth is "defense rather than an obstacle to a contract's formation"). The Court is also not persuaded by Plaintiffs' argument that D.G. was neurodivergent and suffered from anxiety, depression, Oppositional Defiant Disorder ("ODD"), and Attention Deficit Hyperactivity Disorder ("ADHD"), which allegedly prevented D.G. from having capacity to form a contract.[5] Learning disabilities and mental illnesses are not synonymous with mental incompetence, and Plaintiffs cite no law or evidence to persuade the Court that D.G. was mentally incompetent such that D.G. did not have capacity to form a contract. *See Mulligan v. Loft Rehabilitation and Nursing of Canton, LLC*, 236 N.E.2d 1084, 1090 (Ill. App. Ct. 2023) (noting that there is a common law presumption of competence to contract); *cf. Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir. 1996) (noting that mental illness only tolls a statute of limitations if the illness prevents the sufferer from managing his legal rights). Moreover, there is a significant tension between Plaintiffs' mental capacity argument and Plaintiffs' allegations in the complaint

---

[5] Lack of capacity arguments implicate whether a contract formed at all, and so the Court may consider them even when a delegation clause is present. *See Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 741 (7th Cir. 2010) (question of whether "signor lacked the mental capacity to consent" is for courts to decide).

that Defendants' products caused D.G.'s depression, ADHD, and ODD. Doc. 1 ¶ 20. Namely: if Defendants' products caused D.G.'s mental health issues, then D.G.'s mental health issues did not exist at the time he accepted the agreements to begin using the products. Plaintiffs do not address this inconsistency, and so the Court cannot conclude that D.G. lacked mental capacity to enter into the Activision Agreements.

Just because D.G. formed a contract with Activision does not mean that the contract is enforceable. However, that question has been delegated to the arbitrator. The Activision Agreements' delegation provision states that "[t]he arbitrator has authority to decide all issues of validity, enforceability, or arbitrability." Bent Decl. Ex. C at 5; Bent Decl. Ex. D at 12. The Court may disregard the delegation clause and consider Plaintiffs' infancy and other arguments if Plaintiffs successfully challenge the enforceability or validity of the delegation clause specifically. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69-70 (2010). Plaintiffs assert they have made such a challenge on unconscionability grounds, but closer inspection reveals that Plaintiffs' unconscionability arguments are targeted to the Activision Agreements as a whole. The only time Plaintiffs mention the delegation clause specifically is where they challenge the clause as presented "in a take it or leave it contract of adhesion," but this attacks the entire agreement, not the presentation or operation of the delegation clause itself. *See* Doc. 166 at 17. Thus, because the delegation clause is not challenged specifically, it must be given effect. *See Rent-A-Center*, 561 U.S. at 72-74; *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (unconscionability argument delegated to the arbitrator).

The Court concludes that D.G. formed an agreement to arbitrate with Activision. Whether that agreement can be avoided due to infancy, unconscionability, or on other grounds

are questions to be decided by the arbitrator. Thus, with respect to D.G.'s claims, the Court grants Activision's motion to compel arbitration.

### b. Whether Angelilli is bound to arbitrate

Turning to Angelilli, Activision argues she is bound to arbitrate for two reasons: (1) the parental consent provisions in the Activision Agreements prove she agreed to arbitrate and (2) her claims are entirely derivative of D.G.'s claims. Activision also argues that the delegation language in the Arbitration Agreements means an arbitrator must determine whether Angelilli is bound to arbitrate under the agreement accepted by D.G. and, if so, whether her dispute is within the scope of that agreement.

The Court begins with the delegation argument. As explained above, whether a signatory can compel arbitration of a non-signatory raises a question akin to contract formation for the Court to resolve. *See CCC Info. Servs. Inc. v. Tractable Inc*., 2019 WL 2011092, at *2 (N.D. Ill. May 7, 2019); *Coatney v. Ancestry.com DNA, LLC*, 2022 WL 4602653, at *6 (S.D. Ill. Sept. 30, 2022). Therefore, the Court will address the merits of whether a contract formed between Angelilli and Activision.

Activision does not argue that Angelilli played *Call of Duty* herself or dispute her assertion that she never created an Activision/*Call of Duty* account. *See* Angelilli Aff. ¶¶ 59-60. Instead, it argues that Angelilli agreed to arbitrate because when D.G. accepted the Activision Agreements, he was required to represent that she consented to those agreements. But the fact that D.G. made this representation does not prove Angelilli actually did so, especially given her affidavit to the contrary. Angelilli Aff. ¶¶ 56-60. Activision has produced no evidence to undermine Angelilli's statements, and based on the record, one could reasonably conclude that D.G. clicked "Accept" without bothering to consult or apprise Angelilli. *See Tinder v. Pinkerton*

*Security*, 305 F.3d 728, 735 (7th Cir. 2002) (on motion to compel arbitration, nonmovant's evidence "is to be believed and all justifiable inferences … drawn in [her] favor.").

Activision directs the Court to *B.D. v. Blizzard Ent., Inc.* to argue that a minor child's acceptance of an agreement operates to bind their parent so long as the agreement contains such language as: "By clicking 'Agree,' I … acknowledge that my parent or guardian has also reviewed and accepted the [agreement] on my behalf." 292 Cal.Rptr.3d 47, 53 (Cal. App. Ct. 2022). The Court is unpersuaded. Although the California appellate court in *B.D.* quotes the parental agreement language, nowhere does it discuss whether this language suffices to create an agreement between the company and a non-signatory parent. Instead, the plaintiffs in *B.D.* challenged whether the agreements were enforceable assuming plaintiffs had not clicked on the links to review the agreements, whether the arbitration provision was sufficiently conspicuous, and whether the agreement was unenforceable for purporting to waive public injunctive relief. *Id*. at 56-57. Given that it did not address the issue presented in this case, *B.D.* is not useful to this Court's analysis.

Activision also argues that Angelilli's claims are entirely derivative of D.G.'s, and so even though she is a non-signatory, her claims must be compelled to arbitration. For support, Activision cites cases from outside of Illinois which hold that a decedent's agreement to arbitrate encompassed derivative claims brought by non-signatory plaintiffs based on their relationship with the deceased. Doc. 175 at 15, citing *Golden Gate Nat'l Senior Care, LLC v. Jones*, 2016 WL 4744151, at *7 (E.D. Ky. Sept. 12, 2016) (applying Kentucky law and compelling arbitration of derivative loss of consortium claim); *Cole v. GGNSC Stillwater Greeley LLC*, 2009 WL 10711515, at *7 (D. Minn. June 11, 2009) (applying Minnesota law for wrongful death claims); *GGNSC Admin. Servs., LLC v. Schrader*, 140 N.E.3d 397, 407 (Mass. 2020) (applying

14

Massachusetts law for wrongful death claims). The Illinois Supreme Court, however, has rejected the argument that a claim's derivative nature "provides a basis for dispensing with basic principles of contract law in deciding who is bound by an arbitration agreement." *Carter v. SSC Odin Operating Co., LLC*, 976 N.E.2d 344, 359 (Ill. 2012). Thus, without needing to determine whether Angelilli's claims are derivative of D.G.'s, the Court may reject Activision's argument as a basis to compel Angelilli's claims to arbitration.

Because it has failed to identify any valid basis to extend D.G.'s arbitration agreement to non-signatory Angelilli, the Court denies Activision's motion to compel with respect to Angelilli's claims.

## II.    Rockstar Defendants

The Court turns to whether D.G. and Angelilli must arbitrate their claims with the Rockstar Defendants, who are developers of the *Grand Theft Auto* franchise of games. Doc. 125-1 ("Ungberg Decl.") ¶ 4. To play *Grand Theft Auto V* ("*GTA V*"), players must accept an End User License Agreement ("Rockstar EULA") at the time of purchase of *GTA V* and/or creation of a player account associated with Rockstar Games. *Id.* ¶¶ 9-10. In relevant part, the Rockstar EULA contains the following arbitration provisions:

> You and the Company agree that should any dispute, claim, or controversy arise between us regarding any Company products or services (hereafter a "Dispute") … and expressly including the validity, enforceability, or scope of this 'BINDING INDIVIDUAL ARBITRATION' section … [such dispute] shall be submitted to binding arbitration, as described below, rather than being resolved in court.

Ungberg Decl. Ex. A at 11. The Rockstar EULA also contains language directing minor players to seek their parents' consent to the agreement, as provided below:

> To enter into this license agreement, you must be an adult of the legal age of majority in your country of residence … You affirm that you have reached the legal age of majority … If you are under the legal age of majority, your parent or legal guardian must consent to this agreement.

*Id.* at 1 (capitalization omitted).

Rockstar asserts that D.G. accepted the Rockstar EULA based on a player account created using D.G.'s email address and associated with aliases D.G. used when playing. Doc. 125 at 7; *see also* Ungberg Decl. ¶¶ 6-7. Plaintiffs do not dispute that players must agree to the Rockstar EULA to play *GTA V* or that D.G. did so when D.G. created an account to play. Doc. 165 at 3-4.

### a. Whether D.G. is bound to arbitrate

For much the same reasons as stated above in the Activision discussion, the Court concludes D.G. formed an agreement to arbitrate with Rockstar. Plaintiffs do not dispute Rockstar's evidence that D.G. was required to accept the Rockstar EULA in order to access and play *GTA V* and instead argue no contract formed because Angelilli did not consent to the agreement. This mirrors the Plaintiffs' condition precedent argument regarding the parental consent provision in the Activision Agreements. Since the language in the Activision Agreements and the Rockstar EULA are equivalent, and the parties do not dispute that Illinois law applies, the Court concludes that no condition precedent existed, and even if it did, Plaintiffs may not invoke it to void a contract because failure of the supposed condition precedent was within D.G.'s control. *See supra* I(a).

Plaintiffs also argue that D.G. lacked capacity to contract based on his age, that he disaffirmed the agreement, and that the agreement on the whole is unconscionable. These are not challenges to contract formation under Illinois law and so the Court may not consider them if the parties have delegated their resolution to the arbitrator. *K.F.C. v. Snap Inc.*, 29 F.4th 835, 838 (7th Cir. 2022); *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). The Rockstar EULA contains a provision requiring all disputes regarding "the validity, enforceability, or

16

scope" of the arbitration agreement to be "submitted to binding arbitration." Doc. 125 at 10, citing Ungberg Decl. Ex. A at 17. This language satisfies the clear and unmistakable standard required to send post-formation questions to the arbitrator, and so the Court cannot consider Plaintiffs' infancy arguments or unconscionability challenges directed to the Rockstar EULA on the whole. Plaintiffs' only argument framed as a challenge to the delegation clause is that it appears in a "contract of adhesion," which—as a whole-contract challenge—may not be considered by the Court. Doc. 165 at 16.

The Court finds that D.G. formed an agreement to arbitrate with Rockstar, and that this agreement clearly and unmistakably delegated all post-formation questions as to that agreement's enforceability to the arbitrator. Accordingly, the Court grants Activision's motion to compel arbitration with respect to D.G.'s claims.

### b. Whether Angelilli is bound to arbitrate

Rockstar argues Angelilli is bound to arbitrate because (1) the Rockstar EULA that D.G. signed contains a parental consent provision, (2) D.G. acted with Angelilli's apparent authority when he accepted the EULA, and (3) Angelilli's claims are derivative of D.G.'s. Doc. 125 at 7-8. The Court disagrees.

Rockstar's first and third arguments mirror the ones raised by Activision, and the Court rejects them for the same reasons previously stated. *See supra* I(b). Like Activision, Rockstar relies on the fact that D.G. accepted the Rockstar EULA to prove Angelilli consented to the same agreement. Ungberg Decl. Ex. A at 7 ("If you are under the legal age of majority, your parent or legal guardian must consent to this agreement.") (capitalization omitted). This conflicts with Angelilli's sworn statements that D.G. did not seek or secure her consent, *see* Angelilli Aff. ¶¶ 52-53, which the Court must accept as true for the purposes of this motion. As such, the Court

rejects Rockstar's factual argument that Angelilli accepted the agreement, as well as Rockstar's citation to *B.D. v. Blizzard Ent., Inc.*, 292 Cal.Rptr.3d 47 (Cal. App. Ct. 2022), which the Court has already disposed of as not relevant to the contract formation question. The Court also rejects Rockstar's argument that the purportedly derivative nature of Angelilli's claims forces her into arbitration, since Illinois law does not recognize this as a basis for an arbitration agreement to bind a non-signatory. *Carter v. SSC Odin Operating Co., LLC*, 976 N.E.2d 344, 359 (Ill. 2012).

Rockstar also argues that D.G. had apparent authority to accept the arbitration agreement in the Rockstar EULA on Angelilli's behalf. Doc. 125 at 8. Under Illinois law, a principal may be bound to an agreement accepted by its agents. *Peterson v. Devita*, 237 N.E.2d 1010, 1018 (Ill. App. Ct. 2023). An agent has apparent authority "when a principal creates a reasonable impression to a third party that the agent has the authority to perform a given act." *Curto v. Illini Manors, Inc.* 940 N.E.2d 229, 235 (Ill. App. Ct. 2010). The "critical" element to finding apparent authority is proof of "some words or conduct by the principal that could reasonably indicate consent" to have the agent operate on her behalf. *Id.* at 236. Here, Rockstar fails to identify any words or acts by Angelilli, the principal, that would lead Rockstar to reasonably believe D.G. operated as her agent. The only fact Rockstar marshals to support its apparent agency theory is D.G.'s acceptance of the EULA. Doc. 125 at 8; Doc. 176 at 13. But "[o]nly the words and conduct of the alleged principal, not the alleged agent, establish the agent's authority." *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 183 (Ill. App. Ct. 2001).[6]

In a recently submitted notice of supplemental authority, Rockstar and other defendants point the Court to a recent case compelling a non-signatory to arbitrate his claims on apparent

---

[6] Rockstar argues Angelilli's testimony is "self-serving" and "insufficient," *see* Doc. 176 at 13, but even if so, Rockstar has not carried its own burden of advancing evidence that Angelilli made representations to Rockstar that would allow it to conclude D.G. was operating as her agent.

authority grounds. Doc. 204. In *Ayers v. Epic Games, Inc. et al.*, No. 1:24-cv-64-AW (N.D. Fla. Jan. 25, 2024), a plaintiff and his minor son sued game developers for harms allegedly caused by their products. Defendants in *Ayers* moved to compel arbitration, arguing that the plaintiff father was bound to arbitrate under an agreement that his minor son accepted while using his father's player account. Doc. 204-1 at 4. The district court concluded that the plaintiff's minor son had apparent authority to accept the agreement on his father's behalf, reasoning that "[b]y authorizing or allowing [his son] to continue play, Ayers authorized [him] to accept the … terms." *Id*. at 5.

Ayers is distinguishable from this case, however, because D.G. is the individual associated with the player account, not Angelilli. Unlike in *Ayers*, in which the father admitted he personally created the gaming account on behalf of himself and his son, Angelilli has denied any involvement in the account-creation process. *See* Angelilli Aff. ¶¶ 8, 49-54. Rockstar has introduced no evidence to challenge Plaintiffs' assertion and nothing in the aliases or email address associated with D.G.'s account ties them to Angelilli. *See* Doc. 127 ¶¶ 6-7. That is, there is no representation from Angelilli to Rockstar that she had delegated authority to her minor son. Such a representation by the principal is the crux of an apparent authority theory of agency, and since it is missing here, the Court is not persuaded by Rockstar's argument.

Because Rockstar offers no basis to bind non-signatory Angelilli to the arbitration agreement, the Court denies Rockstar's motion with respect to Angelilli's claims.

### III.   **Nintendo**

Nintendo moves to compel arbitration of Plaintiffs' claims based on two agreements—an End User License Agreement ("EULA") and a Nintendo Account User Agreement (collectively,

the "Nintendo Agreements"). The Nintendo Agreements must be accepted before a player can use the Nintendo Switch gaming console and Nintendo eShop, two of Nintendo's products.

When using a Switch for the first time, the user is guided through a series of setup steps. During one step, Nintendo presents the Switch user with an "End-User License Agreement" screen with four visual elements: (1) a written notice that "By selecting the Accept button, you acknowledge that you have read and agree to be bound by the End-User License Agreement," (2) a button titled "View End-User License Agreement," which displays the full text of the EULA when clicked, (3) a checkbox below the "View End-User License Agreement" button next to the word "Accept," and (4) a "Next" button. Doc. 135-1 ("Basso Decl.") ¶¶ 14-16. The screen is displayed below:



Purchasers are not able to click the "Next" button and proceed to the later stages of setup without first checking the "Accept" checkbox. *Id*. ¶¶ 15, 18-20.

To access the Nintendo eShop, users must have a Nintendo account. Basso Decl. ¶¶ 6-7. To create an account, users input their e-mail address or—if the user represents they are under thirteen—the e-mail address of a parent or guardian. Basso Decl. ¶¶ 25-27. During account

creation, users are brought to a screen where they must affirmatively click a checkbox next to the statement, "I agree to the Nintendo Account User Agreement and I acknowledge that I have read the Nintendo Privacy Policy." *Id.* ¶ 30. This statement contains a hyperlink to the Nintendo Account User Agreement, as shown here:



Account creators may not complete account creation until they check the box next to the statement, as the "Submit" button cannot be clicked until the second checkbox is checked. *Id.* ¶¶ 33-35. Nintendo does not permit children under 13 to make their own accounts but does allows adults to create a "Child Account" once an adult account has been created. *Id.* ¶¶ 40-43. When setting up a child's account, adults are also asked to accept the Nintendo Account User Agreement on behalf of their child and may not complete account creation without doing so. *Id.* ¶¶ 47-52.

Both Nintendo Agreements contain arbitration provisions. In relevant part, the Nintendo EULA provides that:

> Any matter we are unable to resolve and all disputes or claims arising out of or relating to this Agreement, including its formation, enforceability, performance, or breach … shall be finally settled by binding arbitration …
> ***
> … [T]his Agreement and any disputes arising in connection therewith shall be subject to and governed by, construed and interpreted in accordance with the laws of the State of Washington, U.S.A., except for its conflict of law rules …

Basso Decl. Ex. A at 3-4. Similarly, the Nintendo Account User Agreement provides:

… [A]ll disputes or claims arising out of or relating to the Nintendo Account Services or this Agreement, including its formation, enforceability, performance, or breach … shall be finally settled by binding arbitration …
***

The laws of the State of Washington, U.S.A., without regard to its conflict of laws provisions, will govern this Agreement and any dispute of any sort pertaining to this Agreement or the Nintendo Account Services that might arise between you and Nintendo.

Basso Decl. Ex. B at 6-7.

Nintendo has supplied evidence that Angelilli set up a new Nintendo Switch and created two Nintendo Accounts to allow D.G. to access the Nintendo eShop and play games on the Nintendo Switch. *Id*. ¶¶ 57-64. Plaintiff does not dispute that she purchased a Switch and created accounts for herself and D.G. using her email accounts. Angelilli Aff. ¶ 32-33. However, Plaintiffs assert that Angelilli does not recall viewing or accepting the Nintendo Agreements while creating those accounts. *Id*. ¶¶ 34-35.

### a. Whether D.G. is bound to arbitrate

Nintendo does not contend D.G. accepted any agreements on his own behalf, but argues he is bound to arbitrate as the third-party beneficiary of the Nintendo Agreements accepted by Angelilli. Doc. 135 at 7. Nintendo also asserts that an arbitrator must decide whether D.G. is bound to arbitrate under a third-party beneficiary theory because the parties have delegated this question by a clear and unmistakable delegation clause. Doc. 177 at 7.

The Court addresses Nintendo's latter argument first, since it bears on whether the Court can consider Nintendo's third-party beneficiary argument. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) (a court "possesses no power to decide" arbitrability issues that parties delegated to the arbitrator). As the Court has already discussed, even if the Nintendo Agreements delegated post-formation arbitrability questions to the arbitrator, the Court must decide the question of whether D.G. is bound to arbitrate under an agreement he did not

personally accept. *See*, *e.g.*, *CCC Information Servs. Inc. v. Tractable Inc*., No. 18-cv-7246, 2019 WL 2011092 at *2 (N.D. Ill. May 7, 2019); *O'Connor v. Ford Motor Co.*, 19-cv-5045, 2023 WL 130522, at *6 (N.D. Ill. Jan. 9, 2023); *cf. Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1019 (7th Cir. 2024). Nintendo cites *Grabowski v. PlatePass, L.L.C.* for the principle that whether an arbitration agreement reaches a non-signatory is within the category of issues delegable to the arbitrator. 20-cv-7003, 2021 WL 1962379, at *4 (N.D. Ill. May 17, 2021). *Grabowski*, however, relies on out-of-Circuit guidance to reach this conclusion. Moreover, *Grabowski* pre-dated the Seventh Circuit's affirmance of *Tractable,* 36 F.4th 721 (7th Cir. 2022), as well as its reasoning in *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022), both of which offered guidance about courts being responsible for determining whether an agreement to arbitrate exists at all. *See O'Connor*, 2023 WL 130522, at *6. The Court therefore adopts the reasoning of *O'Connor* and rejects Nintendo's argument that the Court cannot consider Nintendo's third-party beneficiary theory.

As a preliminary matter, the Court must determine which state's law to apply to the question of whether D.G. is bound to the contract as a third-party beneficiary. Plaintiffs and Nintendo seek the application of Illinois and Washington law, respectively. Illinois "recognizes a strong presumption against conferring contractual benefits on noncontracting third parties" that may be "overcome only where the implication that the contract applies to a third party is so strong as to be practically an express declaration." *Coatney*, 93 F.4th at 1021-22 (collecting Illinois law) (cleaned up). By contrast, Washington's third-party beneficiary standard is more expansive, requiring only that "the terms of the contract necessarily require the promisor to confer a benefit upon a third person." *Lonsdale v. Chesterfield*, 662 P.2d 385, 389-90 (Wash. 1983). As is described below, because the Court concludes that D.G. is a third-party beneficiary

under either standard, the Court will apply Illinois law. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 899 (Ill. 2007) (a "choice of law determination is required only when a difference in law will make a difference in the outcome").

Under Illinois law, D.G. qualifies as a third-party beneficiary of the Nintendo Agreements. After creating her own Nintendo account, Angelilli clicked on the button to create "an account for a child." Basso Decl. ¶ 41. Angelilli provided D.G.'s name and date of birth, then affirmatively checked a box "confirming that, on behalf of [her] child, the user agrees to the terms listed in the Nintendo Account User Agreement." *Id*. ¶ 47. Once the child account was created, D.G. was the sole user of that account. Given that a "Child Account" is explicitly intended to benefit a third party, and that Angelilli signed the Nintendo Agreements "on behalf of" D.G., the Court finds D.G. is a third-party beneficiary of the Nintendo Agreements.

This case is distinguishable from *Coatney*, in which the Seventh Circuit rejected Ancestry.com's argument that children were third-party beneficiaries to a DNA testing agreement because neither the contract as a whole nor the arbitration provision specifically provided that "they were intended for the direct benefit of [the children]" and because the children did not activate their own DNA tests "or otherwise independently engage with Ancestry's services." *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1024 (7th Cir. 2024). Here, the Nintendo account was in D.G.'s name, the Nintendo Agreements were signed by D.G.'s mother "on behalf of" D.G., and D.G. used the child account to play Nintendo. This makes D.G. a third-party beneficiary of the Nintendo Agreements and the Court grants Nintendo's motion with respect to D.G.'s claims.

Even if D.G. did not qualify as a third-party beneficiary, he is bound to arbitrate under the distinct theory of direct benefits estoppel. Although not raised by Nintendo, this equitable

24

doctrine "prevents a non-signatory from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1075 (7th Cir. 2018) (internal quotations omitted); *see also Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 688 (7th Cir. 2005) ("A nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause."). Illinois courts have recognized that the doctrine does not apply where benefits alleged are insubstantial or do not flow directly from the provisions of the contract. *Snyder v. Jack Schmitt Ford, Inc.*, 2022 WL 1197374, at *9 (Ill. App. Ct. Apr. 21, 2022); *see also Peterson v. Devita*, 237 N.E.3d 1010, 1019 (Ill. App. Ct. 2023) (direct benefit theory binds party to arbitration clause of contract where he "has consistently maintained that other provisions of the same contract should be enforced to benefit him").

Here, Nintendo requires parents to accept a Nintendo Account User Agreement containing an arbitration provision when creating a child account. This Agreement dictates the terms the child user must abide by in order to enjoy the benefit of the agreement, which is access to Nintendo's services via a Nintendo account. *See* Basso Decl. Ex. B at 2 (provisions of Nintendo Account User Agreement describing some of the services a user may access via their Nintendo account). It is undisputed that Angelilli created the account for D.G. and that D.G. used the account to enjoy Nintendo's services. Angelilli Aff. ¶ 33. Thus, D.G. directly benefitted from the Nintendo Account User Agreement in a fundamentally different way than the minors in other cases where courts have rejected direct benefit theories of estoppel. *See*, *e.g.*, *Coatney*, 93 F.4th at 1027 (children whose DNA was analyzed did not receive direct benefit of contract signed by parents consenting to the analysis where there were no allegations suggesting children had accessed their genetic analyses); *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1064 (7th Cir.

25

2018) (smoothie purchased by child using her parent's credit card did not make child a direct beneficiary of parent's cardholder agreement). The Court therefore concludes that D.G. is bound to arbitrate because he directly benefitted from the Nintendo Account User Agreement.

### b. Whether Angelilli is bound to arbitrate

The Court next considers whether Angelilli formed an agreement to arbitrate with Nintendo. Plaintiffs concede that Angelilli set up accounts for D.G. but contend no agreement formed because Nintendo did not provide her with reasonable notice of the two Nintendo Agreements.

Illinois recognizes the validity of digital agreements, so long as the "the circumstances of the transaction … provide the offeree with reasonable notice that the terms of a contract are being offered and that certain acts or conduct by the offeree will constitute acceptance of the offer." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 194 N.E. 534, 544 (Ill. App. Ct. 2021). To conduct this inquiry, courts "must look closely at the law and the facts to see if a reasonable person in the [plaintiff's] shoes would have realized that [she] was assenting to" terms offered electronically. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016). For instance, some courts have determined that when an agreement's "terms are not displayed but must be brought up using a hyperlink, courts … have looked for a clear prompt directing the user to read them." *Id.* (describing practice of courts outside Illinois).

Courts in Illinois distinguish "clickwrap" from "browsewrap" agreements, the key difference being that clickwrap agreements require "a website user to expressly assent to the website's terms of use by clicking on an 'I agree' box after being presented with terms, before continuing" with the transaction. *Ambrosius v. Chicago Athletic Clubs, LLC*, 203 N.E.3d 239, 250 (Ill. App. Ct. 2021). An "electronic click can suffice to signify the acceptance of a contract,"

and so courts have generally upheld clickwrap agreements provided "the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros*, 817 F.3d at 1033-34. Browsewrap agreements, on the other hand, "bind users to terms and conditions without the user taking any specific action to manifest assent." *Ambrosius*, 203 N.E.3d 239, 251. As such, they will typically be upheld only when "there is actual or constructive knowledge of terms." *Id*. Some courts also recognize an intermediate species of agreement called a "sign-in-wrap agreement." *Forby v. One Technologies*, 2016 WL 11746078, at *5 (S.D. Ill. Mar. 25, 2016). These agreements are found where a digital page or interface requires a single click by the user to both proceed through the page to a desired service and to assent to an agreement. *See Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 373-74 (E.D.N.Y. 2015) (describing and illustrating sign-in-wrap agreements). These agreements create contract formation issues because even when the user can access the agreement by clicking a hyperlink on the same page, the collapsing of assent to an agreement and the act of proceeding to the desired service into a single click "obscure[s] the physical manifestation of assent," *i.e.*, whether the user is aware of the agreement and assenting to it or whether the user believes they are just agreeing to sign-in or make a purchase. *Id*. at 404. Thus, at least one court has concluded that sign-in-wrap agreements do not provide the adequate notice necessary to form an agreement. *Id*.

With these principles in mind, the Court is not persuaded by Plaintiffs' arguments that Angelilli did not receive reasonable notice. Plaintiffs argue that the above-captioned screens with hyperlinks to the Nintendo Agreements do not provide reasonable notice because they are *not* "next to the only button that will allow the user to continue the sign-in process." Doc 169 at 11-12. But having only one button to click is a problematic feature of sign-in-wrap agreements. Here, by contrast, Nintendo requires the user to execute two affirmative acts—*i.e.*, checking a

box signifying acceptance and *then* clicking the Next or Submit button—when setting up a Switch or creating a Nintendo account. By distinguishing the act of accepting (*i.e.*, checking an "Accept" checkbox) from the act of proceeding to the next step, Nintendo avoids the ambiguity of sign-in-wrap agreements as to what is meant by the user's click.

Angelilli also argues that Nintendo's device setup and account creation screens do not notify users of the arbitration and delegation clauses, nor of the consumer's opportunity to opt-out. But Nintendo plainly prompts users to open the agreements and signals early that the agreements contain arbitration provisions. It may well be that Angelilli and other users accept the Nintendo Agreements without reading them, but that does not nullify the act of acceptance. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome."). Third, Plaintiffs argue Angelilli did not receive subsequent notice of the Nintendo Agreements during the use of Nintendo's products but cite no case where this was required for reasonable notice of an agreement presented in digital clickwrap context. Thus, the Court concludes that Angelilli had reasonable notice of the Nintendo Agreements when she set up the Nintendo Switch and created two Nintendo Accounts. As such, the Court rejects Plaintiffs' argument that no contract formed between Angelilli and Nintendo.

Plaintiffs' remaining arguments about the unconscionability of the Nintendo Agreements and whether Angelilli's claims are within the scope of arbitration are delegated to the arbitrator. The Nintendo Agreements include provisions stating that disputes as to the "formation, enforceability, performance, or breach [of the Agreements] shall be finally settled by binding arbitration." Basso Decl. Ex. A at 3-4; Basso Decl. Ex. B at 6-7. These provisions evince clear and unmistakable evidence that the parties delegated post-formation arbitrability questions to the

arbitrator, including Plaintiffs' unconscionability and scope challenges.[7] Although the Court could entertain challenges to the validity of the delegation clauses specifically, Plaintiffs raise none. They argue that "the delegation clause is an adhesion contract" but that is not an attack directed to the delegation clause specifically. Doc. 169 at 14. Nor are Plaintiffs' arguments about the Nintendo Agreements' placement of limits on consequential damages, the costs of arbitration, the involvement of a minor in the litigation, and the Agreements' failure to warn users about the alleged dangers and addictive features of its products. Doc. 169 at 16-19. Having no basis to question the validity of the delegation clause itself, the Court is required to send these arguments to the arbitrator to resolve on the merits.

Because Nintendo formed an agreement to arbitrate with Angelilli and the parties clearly and unmistakably delegated post-formation arbitrability issues to the arbitrator, the Court grants Nintendo's motion to compel with respect to Angelilli's claims.

## IV. **Epic**

Epic also moves to compel Plaintiffs' claims to arbitration. Epic is the developer of the *Fortnite* franchise of games. Doc. 140-1 ("Saunders Decl.") ¶ 1. Before they can begin playing *Fortnite*, individuals are presented with Epic's End User License Agreement ("Epic EULA"), along with an "accept" or "decline" button. *Id*. ¶¶ 4-6.  A person cannot access *Fortnite* unless they accept the Epic EULA. *Id*. ¶¶ 5, 13. In relevant part and at all relevant times, this agreement contained the following arbitration provisions:

> You and Epic agree to submit all Disputes between You and Epic to individual binding arbitration. "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between You and Epic that relates to your use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration Section.

---

[7] These clauses also purport to delegate questions of formation to the arbitrator, but formation questions are not delegable. *K.F.C.*, 29 F.4th at 837.

Saunders Decl. Ex. C § 12.3.1. The agreement also contains the following provision regarding parental consent:

> To enter in this license agreement, you must be an adult of the legal age of majority in your country of residence … If you are under the legal age of majority, your parent or legal guardian must consent to this agreement.

Saunders Decl. Ex. C at 1-2 (capitalization omitted).

Epic identified two accounts associated with Plaintiffs that were used to play *Fortnite*. Saunders Decl. ¶ 19. Both accounts are registered under D.G.'s name but were created at different times and associated with different email addresses. *Id.* ¶¶ 19, 23. The email address tied to the more recently created account seems to be Angelilli's because her name and place of business appear in the email address. *Id.* ¶ 25. Epic has also produced evidence that the user (or users) of these Epic accounts affirmatively agreed to the Epic EULA. *Id.* ¶¶ 26-33. Plaintiffs do not dispute that D.G. played *Fortnite* using these Epic accounts, or the fact that players must agree to the Epic EULA to access *Fortnite*.

### a. Whether D.G. is bound to arbitrate

Based on his play of *Fortnite* and accounts registered under his name, Epic argues D.G. is bound to arbitrate. Plaintiffs argue he is not because parental consent is a condition precedent to D.G.'s acceptance of the Epic EULA. The parental consent provision in the Epic EULA is virtually identical to similar provisions in the Activision Agreements and Rockstar EULA, and so the Court rejects Plaintiffs' condition precedent argument for the same reasons previously set forth in this opinion. *See supra* I(a).

Plaintiffs also argue that D.G. cannot be compelled to arbitrate with Epic because, as a minor, he lacked capacity to accept the Epic EULA and, in any event, expressly disaffirmed it. Plaintiffs also assert that the Epic EULA on the whole is unconscionable. The Court cannot

30

consider these arguments because the Epic EULA contains a delegation clause providing for the arbitration of all disputes going to the "validity, enforceability, or scope of this Binding Individual Arbitration Section." Saunders Decl. Ex. C § 12.3.1. This constitutes a clear and unmistakable delegation of authority to the arbitrator to decide these questions, and so the Court may not consider Plaintiffs' infancy or unconscionability arguments not directed specifically to the delegation clause. Plaintiffs do not attack the delegation clause specifically other than to note it appears in a contract of adhesion, *see* Doc. 168 at 18, and so the Court must treat the delegation clause as valid and send Plaintiffs' enforceability arguments to the arbitrator.

For all of the reasons stated earlier in this opinion with respect to similarly situated defendants, the Court grants Epic's motion to compel with respect to D.G.'s claims.

### b. Whether Angelilli is bound to arbitrate

Epic asserts Angelilli is bound to arbitrate for two reasons: (1) she was directly involved in the creation of the accounts D.G. used to play *Fortnite* and (2) D.G. had apparent authority to bind her to the Epic EULA.

Epic raises its first argument on the fact that Angelilli set up various gaming devices for D.G. and created accounts associated with other defendants' products. Doc. 172 at 8. As such, Epic argues, the only reasonable conclusion is that Angelilli was directly involved in setup of the two Epic accounts. The Court agrees that this is a reasonable conclusion to draw but disagrees that it is the only one. Epic's argument relies on the inference that because Angelilli's email was used, Angelilli must have created one of the two Epic accounts and therefore agreed to the Epic EULA on her own. But it is not outside the realm of reasonable possibility that D.G. entered his mother's email address without consulting her, especially since D.G.'s name, not Angelilli's, is associated with the account. *See* Doc. 140-1 ¶ 23. Given that the Court is required to draw

31

reasonable inferences in Angelilli's favor, not Epic's, the Court rejects Epic's argument that Angelilli directly agreed to the Epic EULA.

The Court turns to Epic's apparent authority theory. As explained above, under Illinois law apparent authority is found where the "principal creates a reasonable impression to a third party that the agent has the authority to perform a given act." *Curto v. Illini Manors, Inc.* 940 N.E.2d 229, 235 (Ill. App. Ct. 2010). Epic suggests that the use of Angelilli's email address suffices to create this impression, but the Court disagrees. Anyone can use another person's email address to sign up for all sorts of things – that can't possibly be enough to create apparent authority to act on that person's behalf.[8] The cases Epic cites in support of its argument are all distinguishable, because each involved an affirmative act by the principal evincing the agent's authority. For example, in *Heidbreder v. Epic Games, Inc*., the court concluded that a plaintiff's minor son had apparent authority to accept an arbitration agreement on the plaintiff's behalf. 438 F.Supp.3d 591, 597 (E.D.N.C. 2020). But in *Heidbreder* it was admitted that the plaintiff created the account used by his son, and that the account was personalized "with specific names and email addresses" of the father. *Id*. Here, by contrast, Angelilli avers that she did not create either of the two Epic accounts. Angelilli Decl. ¶¶ 62-65.  And more importantly, D.G.'s name, not Angelilli's, is associated with both accounts, which undermines the contention that Epic reasonably believed Angelilli was the account's owner and creator (and consequently, that any users of the account had her apparent authority to accept agreements on her behalf). *See* Doc. 140-1 ¶¶ 19, 23. Epic also cites *DBI Architects, P.C. v. Am. Express Travel-Related Servs., Co.*, but the case is not analogous. 388 F.3d 886 (D.C. Cir. 2004). There, the D.C. Circuit found that an employee had apparent authority to use a credit card based on the fact that the employer

---

[8] Epic does not allege that its account creation process requires the owner of the email provided to log-in and respond to an email from Epic to complete account creation.

repeatedly paid all charges incurred by the employee without protest after receiving notice of those charges from the credit card company. *Id.* at 891. Here, Epic asserts no similar course of repeated communications between Epic and Angelilli, nor any affirmative representation by Angelilli to Epic to suggest she endorsed D.G.'s activities. Finally, *Ayers* is also distinguishable. *Ayers* concerned a plaintiff father who created a player account and allowed his son to use it. When his son later accepted an agreement to arbitrate while using that account, the court found the father was bound to arbitrate under at theory of apparent authority. *See* Doc. 204-1 at 5. Thus, *Ayers* differs from the situation here because the name associated with the at-issue account is D.G.'s own, and Angelilli did not create the Epic accounts. The Court concludes that the association of Angelilli's email with a player account where D.G. is listed as the user does not establish that D.G. possessed apparent authority to enter agreements on Angelilli's behalf.

Because Epic has not carried its burden of showing that Angelilli agreed to arbitrate, the Court denies Epic's motion to the extent it seeks to compel her claims to arbitration.

## V.    **Sony**

Sony seeks to compel arbitration based on agreements Plaintiffs accepted by using its products. Sony is the developer of the PlayStation Network ("PSN"), a digital network that can only be accessed via a PSN account. Doc. 154-1 ("King Decl.") ¶ 5. To create a PSN account, users must accept the PSN Terms of Service and User Agreement ("PSN Terms"). *Id.* ¶ 6. During one step of account creation, Sony presents users with a screen with a scroll box containing the entire text of the PSN Terms and two buttons—one reading "Accept" and the other "Do Not Accept"—as shown below:



*Id.* ¶ 8.

The PSN Terms include arbitration clauses that provide, in relevant part:

> THIS AGREEMENT CONTAINS A BINDING INDIVIDUAL ARBITRATION AND
> CLASS ACTION WAIVER PROVISION IN THE "BINDING INDIVIDUAL
> ARBITRATION" SECTION THAT AFFECTS YOUR RIGHTS UNDER THIS
> AGREEMENT WITH RESPECT TO ANY "DISPUTE" (AS DEFINED BELOW)
> BETWEEN YOU AND [SONY]."
> ***
>
> The term "Dispute" means any dispute, claim, or controversy between you and any of the
> Sony Entities regarding any PSN Services or the use of any devices sold by a Sony Entity
> to access PSN Services … and includes the validity, enforceability or scope of this
> "BINDING INDIVIDUAL ARBITRATION" section.

Doc. 154-3 at 1, 6 (capitalization in original).

Sony offers evidence of two PSN accounts associated with D.G. and/or Angelilli. Doc.

154-1 ¶¶ 16-19. Angelilli does not dispute that she set up one account for D.G.'s use but asserts

that she did not agree to or receive notice of any PSN Terms during or after that process.

Angelilli Aff. ¶¶ 7, 39-42.

### a.  Whether D.G. is bound to arbitrate

Sony argues that D.G. is bound to arbitrate either because he is the third-party beneficiary of the PSN Terms accepted by Angelilli or because he agreed to the Terms in the process of creating his own PSN account.

Plaintiffs admit that Angelilli set up a PSN account for D.G.'s use and do not dispute that the account creation process required Angelilli to accept the PSN Terms. Angelli Aff. ¶ 39. Those Terms provide that a parent "accept[s] the agreement … on behalf of [her] child." Doc. 154-2 ¶ 1.5. Under Illinois law, an "express declaration in the contract identifying the third-party beneficiary by name or by description of the class to which the party belongs" will suffice to make that person a third-party beneficiary." *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1022 (7th Cir. 2024). Such an express declaration is found in the PSN Terms, which required Angelilli, the accepting party, to represent that she was agreeing to the PSN Terms on her child's behalf. Plaintiffs' only argument to the contrary is that the PSN Terms prohibit "representative action." Doc. 167 at 19, citing Doc. 154-2 ¶ 14.5. However, this provision in the PSN Terms involves whether signatories may bring class actions (wherein a single litigant represents a group of similarly situated individuals), which is a distinct issue from whether the agreement contemplates a third-party beneficiary. *See, e.g., Reardon v. Ford Motor Co*., 287 N.E.2d 519, 522 (Ill. App. Ct. 1972) (describing "class or representative action" to be suits where one individual represents those similarly situated).

Since the Court finds that D.G. is a third-party beneficiary of Angelilli's acceptance of the PSN Terms, the Court need not address whether D.G. accepted the PSN Terms on his own behalf, nor address Plaintiffs' arguments that Angelilli's consent was a condition precedent to D.G.'s acceptance of the PSN Terms, that no contract formed because of D.G.'s reduced

capacity to contract, and that D.G. disaffirmed the PSN Terms. In any event, these arguments would be unavailing for the reasons stated in the preceding portions of this opinion.

Plaintiffs' remaining arguments bearing on D.G.'s claims—including that his claims are outside the scope of arbitration and that the PSN Terms are unconscionable—may not be considered by the Court if the parties have delegated the questions to be decided by the arbitrator. Here, the PSN Terms encompass disputes regarding "the validity, enforceability or scope" of arbitration, *see* Doc 154-3 at 6, which satisfies the clear and unmistakable delegation standard. Since Plaintiffs make no arguments directed specifically at the delegation language, the Court treats it as valid and compels Plaintiffs to arbitrate their infancy and unconscionability arguments.

For the reasons set forth in this section and in the preceding sections of this opinion, the Court grants Sony's motion to compel arbitration with respect to D.G.'s claims.

### b. Whether Angelilli is bound to arbitrate

Angelilli is also bound to arbitrate her claims. Plaintiffs do not dispute that Angelilli set up one PSN account for D.G., *See* Angelilii Aff. ¶¶ 7, 39, but contend no agreement was formed because Sony did not provide reasonable notice of the PSN Terms. Doc. 167 at 10-11. Plaintiffs' arguments on this point are not persuasive. Plaintiffs assert that no notice was provided because the PSN Terms do "not include any acknowledgement that a user is binding herself to more than an offer of services." *Id*. at 10.  This is not a compelling assertion: the screen during PSN Account creation where users are presented the PSN Terms plainly requires a user to either "Accept" or not, with the beginning portion of the terms shown on the screen. Plaintiffs also assert that the PSN Terms are not presented "in an obvious manner" or "way that clearly indicates that users should review and consider all the terms in the agreement." Doc. 167 at 10.

Plaintiffs seek support for this argument in *Berkson v. Gogo LLC*, but in that case, the agreement terms were only accessible by hyperlink. 97 F.Supp.3d 359, 373-74 (E.D.N.Y. 2015). Here, by contrast, Sony presents the terms on the screen. As to whether Sony instructed users like Angelilli to consider the agreement, Sony's screen does ask the user to review the PSN Terms, but in any event, the failure to read (or in this case, to scroll) does not render an act of acceptance ineffective. *See*, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997). The Court finds it borderline frivolous to suggest that an adult in this digital age does not know exactly what they are looking at when they see a screen that looks like the PSN screenshot, above, or understand that they are able to scroll through to view the agreement in its entirety. And that is especially true for an adult like Angelilli, who has acknowledged creating gaming accounts on multiple platforms and setting up multiple gaming consoles. *See* Angelilii Aff. ¶¶ 4-5. As such, the Court rejects Angelilli's argument that Sony did not provide her with reasonable notice as to the PSN Terms.

The remainder of Plaintiffs' arguments can be dispatched in short order. Beyond the lack of reasonable notice, Plaintiffs argue that Angelilli's claims fall outside the scope of arbitration and that the arbitration clauses cannot be enforced as unconscionable. These issues have been clearly and unmistakably delegated to the arbitrator by the delegation clause in the PSN Terms. *See* Doc. 154-3 at 6 (arbitration to encompass disputes as to the "validity, enforceability or scope" of the party's agreement to arbitrate). As such, the Court is without power to consider them.[9]

The Court finds Angelilli formed an agreement to arbitrate with Sony when she accepted the PSN Terms. As these terms clearly and unmistakably delegate validity, enforceability, and

---

[9] Plaintiffs have not raised any specific challenges to the PSN Terms' delegation clause for the Court to consider.

scope questions to the arbitrator, Plaintiffs' various post-formation challenges must be heard in arbitration, not by the Court. Accordingly, the Court grants Sony's motion to compel Angelilli's claims to arbitration.

## VI.    <u>Requests for Stays</u>

To summarize the findings thus far: (1) As to the Activision Defendants: arbitration has been compelled with respect to D.G.'s claims and denied as to Angelilli's claims; (2) As to the Rockstar Defendants: arbitration has been compelled with respect to D.G.'s claims and denied as to Angelilli's claims; (3) As to Nintendo: arbitration has been compelled with respect to both D.G.'s and Angelilli's claims; (4) As to Epic: arbitration has been compelled with respect to D.G.'s claims and denied as to Angelilli's claims; and (5) As to Sony: arbitration has been compelled with respect to both D.G.'s and Angelilli's claims. To the extent that their motions to compel arbitration were successful, Defendants (except for Sony) have moved for a stay of litigation as to any non-arbitrable issues pending resolution of arbitration. When a case involves both arbitrable and non-arbitrable issues, the Court must decide whether to stay the non-arbitrable claims pending arbitration or to allow them to proceed in parallel litigation. *See IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529 (7th Cir. 1996). In this case, the division between arbitrable and non-arbitrable issues falls along clean lines: each of the moving defendants (except Sony and Nintendo) have proven an agreement to arbitrate formed between itself and only one of the two Plaintiffs. Therefore, in determining whether to allow one plaintiff's claims to proceed in litigation while the other resolves their claims before an arbitrator, the Court must consider factors including the risk inconsistent rulings, the extent to which parties will be bound by decisions reached in arbitration, and the prejudice that would

result from delay of litigation. *See Volkswagen of America, Inc. v. Sud's of Peoria*, 474 F.3d 966, 972 (7th Cir. 2007).

The Court concludes that a stay is appropriate. Allowing one plaintiff's claims in arbitration to run parallel to the other's in litigation creates a substantial risk of inconsistent rulings. D.G. seeks redress for injuries allegedly arising from his use of Defendants' gaming products, while Angelilli's claims arise from harms that flow from D.G.'s video game addiction. Thus, whether by arbitrator or court, a ruling on the factual issue of whether Defendants' various products caused D.G.'s emotional and behavioral problems is required to resolve both Plaintiffs' claims. Because the pending arbitration is "likely to resolve issues material to the lawsuit," the Court concludes that a stay may prevent potentially inconsistent rulings. *Volkswagen*, 474 F.3d at 972. As for delay, Plaintiffs fail to articulate any prejudice that would result from a litigation stay. The parties do not explore the final *Volkswagen* factor, i.e., whether Angelilli would be bound under res judicata or estoppel principles by an arbitrator's factual ruling pertaining to D.G.'s claims, but in any event, the Court is confident that a stay is proper given the absence of prejudicial delay and substantial overlap in the factual and legal issues central to the claims of both Plaintiffs.

Accordingly, the Court grants Activision's, Rockstar's, Epic's, and Nintendo's request to stay the litigation against them pending the resolution of arbitration. Moreover, though Sony did not request a stay, a stay is required given that the Court has ordered all of the claims against Sony to proceed to arbitration.

## CONCLUSION

For the foregoing reasons, the Court grants the Activision Defendants' motion to compel D.G.'s claims to arbitration and denies the motion as to Angelilli's claims.

The Court grants the Rockstar Defendants' motion to compel arbitration with respect to D.G.'s claims and denies the motion as to Angelilli's claims.

The Court grants Nintendo's motion to compel arbitration with respect to D.G.'s claims and Angelilli's claims.

The Court grants Epic's motion to compel arbitration with respect to D.G.'s claims and denies it as to Angelilli's claims.

The Court grants Sony's motion to compel arbitration with respect to D.G.'s claims and Angelilli's claims.

Moreover, the litigation against Activision, Rockstar, Epic, Nintendo, and Sony is stayed pending the resolution of arbitration.

Finally, to the extent a Defendant has successfully moved to compel arbitration and also filed a motion to dismiss the complaint, the Court strikes the motion to dismiss with respect to that defendant at this time, without prejudice and with leave to re-file once arbitration has concluded and the stay has been lifted.

Dated: 2/18/2025

_____
APRIL M. PERRY
United States District Judge